ARMSTRONG *v.* MORRILL.

1. Judgment in ejectment, in favor of a single plaintiff, sustained, where some counts in the declaration alleged a possession in himself alone, at the time of the ouster, though other counts alleged the possession to have been in him jointly with others; there having been no motion in arrest of judgment or other objection made below to the judgment in the form mentioned, which was one upon a verdict thus finding.

2. The mere making of a deed to one as trustee does not vest the trustee with title if he never in any form have accepted the trust; and to show that the trustee did not accept it, a declaration, not under seal, but signed by him, nine years after the deed, making known to all whom the matter concerned, "that immediately on his receiving notice of the conveyance he did positively refuse to accept, or to act under the trust intended to be created, and that he had at no time since accepted the trust or acted in any wise as trustee in relation to it," is proper evidence to show the fact, the party being dead and his handwriting proved.

3. Under the act of Virginia, of June 2d, 1788, authorizing the governor to issue grants with reservation of claims to lands included within surveys then made, the reservation in patents granted under the act excludes from the operation of the patent all lands held by prior claimants at the date of the survey, within the exterior boundary of the patent, whether the title was only inchoate or had been perfected by grants.

4. Where' the lands of. A. in the adverse possession of B. were forfeited to, the State of Virginia under its act of 27th February, 1835, declaring forfeitures for non-payment of taxes, but were allowed by a subsequent and private act to be redeemed by the original owner, *held* that the forfeiture to the State broke, in point of law, the continuity of the adverse possession, and that such adverse possession (though it might have been, in fact, continuous) having been, in law, thus broken, was neither restored upon the redemption so as to be continuous in law, nor was it so affected as that the persons holding adversely could tack the adverse possession prior to the forfeiture to, the adverse possession subsequent to the redemption and *so* make out a term of adverse possession which a statute required in order to give title.

ERROR to the District Court of the United States for West Virginia; the case having been thus:

. Lot. M. Morrill brought ejectment, on the 15th of April, 1857, in the District Court for the Western District of Virginia (now the court below), both having circuit court jurisdiction, against Armstrong and others, to recover 1500 acres of land. In one count Morrill alleged that he was possessed of it when the defendants wrongfully entered; in another, that James Dundas and Benjamin Kugler were so possessed. An amended declaration alleged, in its first count, the possession to have been jointly in Morrill, Dundas, and Kugler; and in its second, to have been in Morrill alone. In a new count still, the possession was alleged to have been in William M. Tilghman.

The plaintiff's title rested on a survey to Albert Gallatin, dated June 12th, 1770, for a large tract (of which that in controversy was said to be part), followed by a patent dated February 10th, 1786, for the tract described in the survey. In 1794 Gallatin conveyed to Robert Morris, of Philadelphia, who, in 1795, made a deed of the tract to Thomas Willing, John Nixon, and John Barclay, and the survivors and survivor in fee, in trust for a land association, called the North American Land Company. Messrs. Nixon and Barclay accepted the trust. Mr. Willing's action appeared before the court no otherwise than by a paper which the plaintiffs offered in evidence, thus:

" I, Thomas Willing, of the city of Philadelphia, do hereby

declare and make known unto all whom it doth or may concern, that immediately on my receiving notice that Robert Morris had conveyed certain estates of land to John Nixon, John Barclay, and myself, in trust for the North American Land Company, I did positively refuse to accept or to act under the trust so intended to be created, and that I have at no time since accepted the said trust, or acted in any wise as trustee in relation thereto.

"Witness my hand, this 19th day of December, 1806.

.."THOMAS WILLING."

The death of Mr. Willing, who was president of the first Bank of the United States, and otherwise, in his day, one of the best known characters in Philadelphia, and the genuineness of his signature, were sworn to *ex parte*, by one of his sons and by two other witnesses, and the signature was certified by the examiner of the Supreme Court of Pennsylvania, in 1844, to have been "proved" before him in due form of law. The instrument had also, along with the affidavits and the examiner's certificate of probate, been admitted to record by the clerk of Cabell County, Virginia, where apparently some of the lands lay.

The title being in this state, the legislature of Virginia, on the 27th of February, 1835, passed an act, by whose second section it was enacted that all lands not then in the actual possession of the owner, by himself or his tenant in possession, and which had not been entered for taxation on the books of the commissioners of the revenue, on which the taxes had not been paid, shall become "*forfeited* to the Commonwealth," after July 1st, 1836.

The 3d section of the act ran thus.

"That all right, title, and interest which may hereafter be vested in the Commonwealth by virtue of the provisions of the section of this act next preceding herein, shall be transferred and vested in any and every person or persons (other than those for whose default the same have been forfeited and their heirs or devisees), who are now in possession of said lands, or any part or parcel of them, for so much thereof as they have just title or claim to, legal or equitable, *bonâ fide* claim held or derived under grants from the Commonwealth dated prior to

April 1st, 1831, who shall have discharged all taxes duly assessed and charged against her, him, or them upon such lands, and all taxes that ought to have been assessed and charged thereon, from the time when he, she, or they acquired his, her, or their title thereto, whether legal or equitable."

Under this act, the land conveyed by Mr. Morris became forfeited.

In 1844 the legislature passed "An act for the relief of James Dundas and Benjamin Kugler," who had apparently become large shareholders of the North American Land Company, and who by sundry conveyances were then vested with whatever estate *Nixon* had been vested with by the deed of 1795, of Mr. Morris to Messrs. Willing, Nixon, and Barclay. By this act of 1844, Dundas and Kugler were authorized to redeem the lands forfeited under the already-quoted act of 1835; on which redemption by them the title vested by the forfeiture was released by the terms of the act to them for the benefit of the land company.

The act contained, however, in its second section, this proviso:

"*Provided*, however, that nothing herein contained shall be construed to deprive any persons having a *legal* or *equitable* title to these lands, by virtue of a subsequent grant from the Commonwealth, *or otherwise*, of his, her, or their right, title, or interest, *but the rights of such claimants shall remain the same as if this act had never been passed.*"

Dundas and Kugler having, in May, 1845, redeemed the land, now put in evidence the certificate of the Auditor of Public Accounts of Virginia, to show that the taxes had been paid in pursuance of the act of 1844, and in 1845 the heirs of Barclay, who had survived Nixon, conveyed all his estate in the lands to Dundas and Kugler, as trustees of the North American Land Company. These two conveyed to Morrill, the plaintiff.

So far as to the plaintiff's title; as to which it will be observed that *if* any title passed to Mr. Willing by the deed of. Mr. Morris to him, Nixon, and Barclay, and had not passed

from him by his disclaimer of 1806, then *his* estate, whatever it was, had not been conveyed to any one.

Now as to the defendant's title. Surveys having been made in different parts of the State, subsequent to the treaty of 1783, which included within their exterior boundaries smaller tracts of prior claimants, and these being reserved to such claimants in the certificates granted by the surveyors, doubts arose as to the authority of the governor to grant patents in such cases. The legislature of Virginia accordingly passed, June 2d, 1788,* an act to authorize the governor to issue them. This act made a recital and enactment thus:

"Whereas sundry surveys have been made in different parts of the Commonwealth, which include in the general courses thereof, sundry smaller tracts of *prior claimants,* and which, in the certificates granted by the surveyors of the respective counties, *are reserved to such claimants;* and the governor or chief magistrate is not authorized by law to issue grants upon such certificates of surveys."

And it enacted :

Section 1. "That it shall and may be lawful for the governor to issue grants *with reservation of claims* to lands included within such surveys, anything in any law to the contrary notwithstanding."

With this statute in force, one Samuel M. Hopkins obtained a survey and patent from the State of Virginia, dated July 1st, 1796.

The survey was for 200,000 acres, and gave boundaries including a much larger area, closing with this statement, to wit:

"An allowance of 227,460 acres is made in the calculation of area of this plat for prior claims included within boundary thereof."

The patent followed the boundaries of the survey in its grant of the 200,000 acres, and concluded as follows:

---

* Second Revised Code of Virginia, p. 434, ch. 58.

"But it is always to be understood that the survey upon which this grant is founded includes 227,460 acres, exclusive of the above quantity of 200,000 acres, all of which having a preference by law to the warrants and rights upon which this grant is founded, liberty is reserved that the same shall be firm and valid, and may be carried into grant or grants; and this grant shall be no bar in either law or equity to the confirmation of the title or titles to the same as before mentioned and reserved, with its appurtenances; to have and to hold the said tract or parcel of land, with its appurtenances, to the said Samuel M. Hopkins (except as before excepted) and his heirs forever."

This title of Hopkins became afterwards vested in one Watson.

Evidence was given tending to show that the patent to Hopkins embraced within its exterior boundaries the entire tract claimed by the plaintiffs, and that the defendants and those under whom they claimed had paid the taxes and assessments thereon, from the month of September, 1834, to the year 1840.

In addition to this paper-title the defendants set up also one founded on adverse possession. They had taken actual *bonâ fide* possession of the land in 1827, and had kept possession up to November 1st, 1836, when the premises in controversy were forfeited to the State, and they continued to occupy them throughout the term that the title was vested by the forfeiture in the State, and so also after May, 1845 (when by the redemption the tract was revested in its original owners), to the time when the suit was instituted, April 15th, 1857. Such possession before the forfeiture was, however, it will be observed, not for the term of fourteen years, the time then required by law in Virginia to bar a recovery, nor did such possession subsequent to the date of the reves-titure, and before the bringing of this suit continue long enough to bar a recovery. The term before the forfeiture and the term after the revestiture tacked together constituted, however, an adverse possession of fourteen years, and would maintain the defence.

The defendants below—who had objected to the reception

in evidence of what was called the disclaimer of Mr. Willing (the paper printed *supra*, pp. 121–2), and had excepted to its admission—maintained: ·

I. As related to the construction of the patent to Hopkins.

1. That by *its terms it covered* all lands lying within its exterior boundaries, except such as came within the reservation contained therein; and that the burden was on the plaintiff to show himself within the reservation, which he had not done.

2. That only lands held by inchoate equitable title, not carried into grant when Hopkins's entry and survey were made, come within the reservation.

3. That lands lying within the exterior boundaries of the Hopkins grant, which had been patented prior to Hopkins's entry, survey, and grant, would, upon becoming forfeited to the State of Virginia, by virtue of the act of 27th February, 1835, inure to and vest in those holding under the Hopkins patent, provided such owner had complied with the other conditions mentioned in said act.

II. As related to their second ground of defence, namely, adverse possession, the defendants contended:

1. That the continuity of adverse possession as against the prior owners was not broken by the forfeiture and vesting in the State, November 1st, 1836, and continuance till redeemed by Dundas and Kugler in 1845.

2. That if it was broken, it was restored upon the principle of *remitter* or relation upon the redemption by Dundas and Kugler. And if neither—

3. That it was competent for the defendants to tack the adverse possession prior to the forfeiture to that subsequent to the redemption, in order to make out the fourteen years required by the statute to bar the action.

The defendants accordingly asked the court to charge:

"*First.* That the reservation in the patent to Hopkins, was of lands the titles to which were inchoate, and not of lands which had been granted by patent previous to the date of Hopkins's survey and entry.

"*Second.* That the patent covered all lands lying within the

exterior boundary of the survey, for which patents had issued previous to Hopkins's entry, survey, and patent, and became a junior grant to that issued to Gallatin.

" *Third.* That if Watson was the owner of the land described in the patent to Hopkins at the time the land in controversy became forfeited to the Commonwealth; and if he was, on the 27th of February, 1835, and up to the time of the forfeiture, in the actual *bonâ fide* possession, by himself or tenant, of the land in controversy, or any part thereof, under the patent to Hopkins; and if he, Watson, had, at the date of the forfeiture, discharged all taxes upon the land, then that the Gallatin title inured to and vested in Watson, and that the plaintiffs could not recover.

" *Fourth.* That if the jury are satisfied, from the evidence, that adversary possession commenced before 1st of November, 1836, and the same possession continued during the time of the forfeiture, as well as from the 8th of May, 1845 (the time of redemption), up to the time of the institution of this suit, and by adding the time of adversary possession before forfeiture to the adversary possession after redemption, makes a period of fourteen years, then they must find for the defendants, or such of the defendants as make out the fourteen years aforesaid.

" *Fifth.* That the act of 1844, which authorized Dundas and Kugler to redeem the lands therein specified, did not so operate as to relieve them from the effect of the statute of limitations, which had commenced running for the defendants before the forfeiture, for the time the land in controversy was so forfeited, if the jury believe the defendants continued their possession without interruption during the forfeiture and up to the time of redemption, and that the defendants continued the possession to the time of the institution of this suit."

The court refused these instructions, and charged that:

" The grant to Hopkins, embracing within its exterior boundaries 227,460 acres of land, which is reserved and excepted to prior claimants, does not operate to divest them of their title, unless they fail to show themselves entitled to the land under said reservation; nor does the grant pass any legal title to the grantee of the lands so reserved and excepted by it, where the same have been previously appropriated and granted by the Commonwealth, inasmuch as it appears that the patentee gets

all the lands he paid for, or for which he is chargeable with taxes.

"To secure to the defendants the benefit of the forfeiture of the Gallatin title, the jury must be satisfied that the Hopkins grant is the younger, covers and includes the land in controversy, and that Watson and those claiming under him were in the actual possession of the land, claiming the same in good faith, having discharged all the taxes due the State duly assessed and charged against said land, as well as all taxes that should have been assessed and charged against the same from the date of the deed from Hopkins to Watson; otherwise, the forfeiture of the Gallatin title would not, under the act of 1835, be transferred to Watson or to those claiming under him.

"To defeat a recovery in this cause, under the statute of limitations, the defendants must have held *unbroken and uninterrupted adverse* possession of the premises in controversy, for a period of fourteen years prior to the institution of this suit."

[The nature of this possession was explained by the court to the jury.]

"If Watson or those claiming under him entered upon the land claimed by the plaintiffs in 1832, '33, '34, '35, or '36, and the same became forfeited by the failure of the owners to enter the same upon the books of the commissioner of the revenue of the proper county and pay the taxes properly chargeable thereon, the same became vested in the Commonwealth by operation of law on the first day of November, 1836, and the possession of the defendants upon the said first day of November, 1836, terminated, and the possession of the land passed into and remained in the Commonwealth until the same was transferred to Dundas and Kugler by the act of the 12th of February, 1844; and the adverse possession acquired by the said defendants before the first day of November, 1836, cannot be connected with the adverse possession acquired by the defendants after Dundas and Kugler became revested with the title of the Commonwealth, under the act passed for their relief on the 12th of February, 1844."

The defendants excepted to the ruling of the court refusing to give the instructions asked by them and in giving the instructions given,

The jury found a verdict for *Morrill;* the verdict containing nothing about Dundas, Kugler, or Tilghman. And no motion in arrest of judgment being made, nor any objection to the finding for Morrill alone, judgment was entered on the verdict. The defendants brought the case here.

*Messrs. B. H. Smith, W. M. Evarts, and S. A. Miller, for the plaintiffs in error:*

1. There is error in the form of the verdict. The code of West Virginia requires that the jury shall find *for or against all* the parties to the record. The present verdict fails to find *at all* as to Dundas, Kugler, and Tilghman, who were co-plaintiffs with Morrill.*

2. The writing purporting to be signed by Mr. Willing was made near eleven years after Mr. Morris's deed to him. It has no seal. It was thus not a *deed;* or as such operating to reconvey the estate previously vested in him. Neither was it *testimony* to prove that he did not become a trustee. In no view then is it of value. It had none of the forms and requisites of a deposition, competent to prove his renunciation of the trust prior to the estate's vesting, nor was it sufficient in law to divest him of the estate when it had once become vested.

3. The first three instructions asked by us have reference to the same legal question, and should be considered together. By the act of June, 1788, a person having a survey, including in its bounds *prior claims* of others, might have a patent according to the bounds of such survey, excepting in the patent all such prior claims. Such patents were numerous under that act, and became known to the country and the courts as " inclusive surveys." The patent of Hopkins shows the form of the reservation adopted by the executive of Virginia. That form is common to all inclusive grants. The exception necessarily excludes from its operation a patent which is older than the entry or survey on which the exclusive grant is founded.

---

* Chapter 90, §§ 23, 24, p. 520.

The words "prior claims," in the statute, refer to entries and surveys which precede a patent, and constitute only equitable or inchoate titles, which would be defeated by the first patent, giving the elder legal title, without the exception. No such exception is necessary to protect an existing patent. But the elder legal title protects itself. The words "prior claims," used in the statute, had thus received, by prior use in Virginia legislation about lands, a distinct and definite application to equitable titles.*

If the patent to Gallatin, dated in 1786 (nine years before the entry of the inclusive grant), is not within the exception, then Hopkins's patent secures to the patentee the same title to the land that a junior patent located on an elder patent would secure. It is a title well known and well understood in Virginia legislation. The whole of West Virginia was covered with large elder grants, and occupants under junior grants have been sedulously protected against such large unsettled surveys, on which elder grants have been issued. Where these elder grants have been forfeited for non-payment of taxes and non-entry, the law casts the forfeited title on the junior grant. As the land of Hopkins or Watson was not forfeited, the taxes paid and the land occupied, the forfeited Gallatin title, which is the land in controversy, inured to Watson and those holding under him as the junior grantee.

We therefore contend that the first, second, and third instructions ought to have been given.

4. As to the adverse possession: The court erred in not giving the fourth and fifth instructions asked for.

The fourth instruction asked to unite the adversary possession which occurred before forfeiture with the possession after redemption. This indeed falls short of the legal rights of the defendants, for when time commences to run there is no law that stops it. But suppose that it stops for the State, it does not follow that it stops for the defaulter. So far as it

---

* Second Revised Code of Virginia, pp. 34–8–9, 382–5–7–8, 392–7; Wilds *v.* Serpell, 10 Grattan, 406; Staats *v.* Board, Ib. 400; Atkins *v.* Lewis, 14 Id. 30.

has run, it is valid. After the redemption, the time run is also valid. Is it not just then to unite them? By the instruction asked for by us the plaintiff gained the time of the forfeiture; but that gain, obtained by sheltering himself under the State, has no such merit as to avoid the valid time which preceded the forfeiture.

The fifth instruction should also have been given. If this was a suit with the State, or a purchaser from the State, the statute might not be a bar. But it is a suit between individuals, one of whom for a time had lost his estate by neglect of duty; yet, by the leniency of the government, he is allowed to be remitted to his former estate without prejudice to his rights by the State. He pays taxes and redeems. He does not hold under the State, but under his own title, which he has redeemed. He pays no consideration to the State. He pays the debt for which the State held a lien on the land. He cannot and ought not to be permitted to thrust the State between him and the defendants.

5. There is also error in the instructions actually given by the court, and excepted to by the defendants.

*Mr. G. D. Camden, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Absolute title and the right of possession are claimed by the plaintiff to the tract of land in controversy, and the actual possession of the same being in the four defendants named in the declaration, he brought an action of ejectment against them to recover possession of the tract. He alleges in the first count of the original declaration that on the day therein named he was possessed in fee simple of the tract; that on the eighth of October following the defendants entered into the premises, and that they unlawfully withhold from him the described tract. Quite unlike that, the second count alleges that the primary possession of the tract was in one James Dundas and one Benjamin Kugler, and that the defendants unlawfully withhold the possession from those parties. Process was served and the defendants appeared

and demurred to the declaration, and the court sustained the demurrer as to the second count but overruled it as to the first. Leave to amend was granted, and an amended declaration was filed, containing three counts, of which the first is in the name of the plaintiff and the other two persons named in the second count of the original declaration. All three sue in that count as joint plaintiffs, but the second count corresponds in all respects with the first count in the original declaration, which renders it unnecessary to describe the third, except to say that the other two persons are alleged to have been the primary possessors of the tract, and that the claim to recover possession is made in their names as well as the claim for damages. Both parties acquiesced in the decision of the court overruling the demurrer to the first count and sustaining it as to the second of the original declaration, and the defendants pleaded to the merits that they were not guilty of withholding the premises as alleged in the new counts filed by leave of court. Issue was tendered and joined, but the plaintiffs, before trial, obtained leave to file a fourth count, in which it is alleged that one William M. Tilghman was the primary possessor of the tract, and the charge, in that count, is that the defendants unlawfully withhold from him the actual possession of the same described tract of land. Subsequently the parties went to trial and the verdict was for the plaintiff, as described in the first count of the original declaration, and also in the second count of the amended declaration.

By the verdict the jury found that the plaintiff, Lot M. Morrill, had an estate in fee simple in the premises, except as to a small parcel therein described, and they also assessed nominal damages for the plaintiff. Judgment was duly rendered against the first three defendants, the death of the other having been suggested before the trial, and the survivors sued out a writ of error and removed the record into this court.

To sustain the issue on their part the plaintiffs gave in evidence : (1.) A copy of a survey made by the surveyor of the proper county of the State for Albert Gallatin, assignee

of Stephen Lacoste, of fifteen hundred acres of land, part of a land-office warrant of five thousand acres, dated June 27th, 1770, bounded as therein described. (2.) Copy of the patent to Albert Gallatin, dated February 10th, 1786, for the tract of land described in the survey. (3.) Also copy of a deed from Albert Gallatin, dated May 7th, 1794, to Robert Morris, conveying the same land. (4.) Deed from Robert Morris and others to Thomas Willing, John Nixon, and John Barclay, dated March 5th, 1795, conveying the premises to them and the survivor and survivors of them, and the heirs of the survivor in trust, as more fully set forth in the deed exhibited in the record. (5.) Certificate of William F. Taylor, auditor of public accounts for the State, showing that James Dundas and Benjamin Kugler, trustees as aforesaid, on the eighth of May, 1845, redeemed the lands in question by the payment of the required sum into the treasury, in manner and form as more fully set forth in that certificate, and certain others also introduced by the plaintiff and exhibited in the bill of exceptions. (6.) Disclaimer of Thomas Willing, dated December 19th, 1806, in which he states that he did positively refuse to accept or act under the trust, and that he has not at any time since accepted the said trust, or acted in any wise as trustee, under that deed. (7.) Also deed dated June 17th, 1845, from John M. Barclay and others to James Dundas and Benjamin Kugler, conveying to them all the right, title, and interest of the two trustees who did accept the trust created by the preceding deed. (8.) Deed dated December 1st, 1854, from James Dundas and Benjamin Kugler, trustees of the North American Land Company, to the plaintiff in whose favor the judgment was rendered.

Evidence was also introduced by the plaintiffs showing that the land in controversy, on the 1st day of November, 1836, became forfeited to the State by virtue of the second section of the statute of the State passed on the 27th of February, 1835, as construed by the Supreme Court, or Court of Appeals, of that State.* Forfeiture in such a case became

---

* Sessions Acts, 1835, p. 12; Staats v. Board, 10 Grattan, 400.

absolute and complete by the failure to enter and pay the taxes on the land and the damages, in the manner therein prescribed, and no inquisition or judicial proceeding or inquest or finding of any kind was required to consummate such a forfeiture.* Owners or proprietors of any tract of land lying west of the Alleghany Mountains, granted by the State before the first day of April, 1831, were required by the act of the twenty-seventh of February, 1835, to enter or cause to be entered, on or before the first day of July of the succeeding year, on the books of the Commissioners of the Revenue for the county wherein any such tract or parcel of land may lie, all such lands as he or they owned or claimed, through title derived, mediately or immediately, from the State, and have the same charged with all taxes and damages in arrear or properly chargeable thereon. They were also required to pay and satisfy all such taxes and damages which would not have been relinquished and exonerated by the second section of the act of the tenth of March, 1832, had they been returned for their delinquency prior to the passage of that act, and the provision was that if they failed to comply with those requirements " all such lands or parcels thereof not then in the actual possession of such owner or proprietor, by himself or his tenant in possession, *shall become forfeited to the Commonwealth* after the first day of July, eighteen hundred and thirty-six, except only as hereinafter excepted."

Provision is also made by the third section of the act that all right, title, and interest vested in the State by the preceding section of the act shall be transferred and absolutely vested in any and every person or persons, other than those for whose default the same have been forfeited, their heirs, or devisees, now in actual possession of said lands, or any part or parcel of the same, for so much thereof as such person or persons have just title or claim to, legal or equitable, *bonâ fide* claimed, held, or derived from or under any grant of the State bearing date previous to the period of time

---

* Wild's Lessee *v.* Serpell, 10 Grattan, 405; Hale *v.* Branscum, Ib. 418.

mentioned in the preamble to the second section, who shall have discharged all taxes duly assessed and charged against him or them upon such lands, and all taxes that ought to have been assessed and charged thereon from the time he or they acquired title thereto, whether legal or equitable. Appended to that section, however, is a proviso that nothing therein contained shall be so construed as to impair the right or title of any person or persons who have obtained grants from the State for the same land and have regularly paid the taxes thereon.

Section four provides, among other things, that the proprietors of such lands, their attorney or agent, of the land returned delinquent for non-payment of taxes for the years eighteen hundred and thirty-two and the succeeding year, may pay the taxes and charges upon said lands for each of those years to the sheriff of the county where the lands lie, and take his receipt therefor and deliver the same, on or before the first day of November, 1836, to the clerk of the County Court of said county.*

Beyond all doubt the lands described in the deed of Robert Morris and others to the grantors of the plaintiff, became forfeited to the State by reason of the failure to enter the same on the books of the Commissioners of the Revenue, as recited in the preamble to the act of the twelfth of February, 1844, in which it is also stated that the grantors of the plaintiff petitioned " the General Assembly for permission to redeem the said lands upon the payment of all the taxes and damages due thereon."† By the first section of that act they were empowered " to redeem the whole or any part of the aforesaid lands by having the same entered upon the books of the Commissioners of the Revenue of the county wherein the land may lie, and assessed with all taxes due thereon, to be ascertained in the same manner that the back taxes on omitted lands are now ascertained by the several commissioners of delinquent and forfeited lands, and paying into the treasury of the State, on or before the first day of

---

* Sessions Acts, 1835, pp. 12, 13.    † Sessions Acts, 1843–4, p. 108.

June" of the succeeding year, "the amount of the taxes so assessed, together with six per centum per annum damages thereon." They complied with those conditions, and the second section of the act provided, "that upon the payment of the taxes and damages aforesaid, all the right, title, and interest which may have vested in the president and directors of the Literary Fund, by the said forfeiture, to such part or parts of the said lands as may be redeemed as aforesaid, shall be and the same are hereby released unto the said James Dundas and Benjamin Kugler, . . . for the use and benefit of the shareholders of the said North American Land Company." Annexed to that, however, is a proviso that nothing herein contained shall be construed to deprive any person or persons having a legal or equitable title to any of these lands by virtue of a subsequent grant from the State or otherwise, of his or their right, title, or interest, but the rights of such claimants shall remain the same as if this act had never been passed.

Documentary evidences of title were also introduced by the defendants, as follows: (1.) The plat and certificate of a survey made for Samuel M. Hopkins for two hundred thousand acres of land in the county of Kanawha, dated the tenth of December, 1795, as more fully set forth in the record, which contains the following certificate: "Surveyed for Samuel M. Hopkins two hundred thousand acres of land in the county of Kanawha, by virtue of two land-office treasury warrants, each for one hundred thousand acres;" and then follows the boundaries, at the close of which is the following statement: "An allowance of two hundred and twenty-seven thousand four hundred and sixty acres is made in the calculation of the area of this plat for prior claims contained in (the) boundary thereof." (2.) The patent, dated July 1st, 1796, issued on that survey to Samuel M. Hopkins for two hundred thousand acres by the governor of the State. Founded, as the patent is, upon the certificate of survey, it contains the same boundaries and concludes as follows: "But it is always to be understood that the survey upon

which this grant is founded, includes two hundred and twenty-seven thousand four hundred and sixty acres," exclusive of the above quantity of two hundred thousand acres, "all of which having a preference by law to the warrants and rights upon which this grant is founded, liberty is reserved that the same shall be firm and valid, and may be carried into grant or grants," and this grant shall be no bar in either law, or equity to the confirmation of the title or titles to the same, as before mentioned and reserved, with the appurtenances. (3.) Deed from Oliver Wolcott and others to James T. Watson, dated June 22d, 1808, conveying to him, among other things, the lands embraced in the patent to Samuel M. Hopkins. (4.) Evidence tending to show that the patent to Samuel M. Hopkins embraced within its exterior boundaries the entire tract claimed by the plaintiff, as shown by certain plats which were also introduced. (5.) Parol evidence was also introduced by the defendants tending to prove that James T. Watson, claiming under the patent to Samuel M. Hopkins and the deed to himself, took actual and *bonâ fide* possession, in the year 1827, of the lands in controversy, as well as of the coterminous surveys of Savary and Gallatin, previously introduced in evidence, and that he, as early as the month of September, 1834, discharged all taxes and damages rendered against him upon said two hundred thousand acres of land, and all that ought to have been charged against him up to the year 1840, as the same became due. (6.) Other evidence was also introduced by the defendants, deraigning the title from the last-named grantee to them or one of them, which it is not important to notice, as it is not the subject of controversy.

First objection to the judgment has respect to the form of the verdict, because it does not find for or against all the parties mentioned in the different counts of the declaration, but the court is of the opinion that the objection is without merit, as the finding conforms to the first count in the original declaration and to the second count in the amended

declaration. No motion in arrest of judgment was made, and as no such question was raised in the court below, and as the finding is fully justified by two of the counts and by the evidence reported, the objection is overruled.

Adopting the order of events at the trial, the next question arises from the exception of the defendants to the ruling of the court in admitting in evidence the paper-writing called the disclaimer of Thomas Willing, in which he states, under date of the nineteenth of December, 1806, to the effect that he positively refused to accept the trust intended to be created by the before-mentioned deed to John Nixon, John Barclay, and himself, and that he never did accept the same or in anywise act as trustee under that instrument. Before offering that paper the plaintiff introduced the deed to which it relates, and having proved the signature of the signer, the plaintiff offered the paper as tending to show that the signer never accepted the trust described in that deed. Two objections were made to the admissibility of the paper: (1.) That it was insufficient as a disclaimer as it was not under seal, but the paper was offered merely as evidence to show that the signer never accepted the trust, and not as an instrument releasing a vested right, which is all that need be said in reply to that objection. (2.) That it was not admissible as evidence that he never accepted the trust, because it was not under oath. Appended to that paper are the affidavits of three witnesses proving that the signature of the signer is genuine. Annexed to that is the certificate of an examiner of the Supreme Court of the State of Pennsylvania, dated the third of March, 1844, that the signature of the signer of the paper was proved before him in due form of law, and also the certificate of the clerk of Cabell County Court, Virginia, under date of the twenty-ninth of March, 1856, that the instrument, together with the certificates of proof, was admitted to record.

Authorities are hardly necessary to show that the mere making of a trust deed, like the one in question, without any acceptance, express or implied, by the trustee, is not

sufficient to vest in the trustee the title to the land mentioned in the deed, and that parol proof is admissible in such a case to show that the trust was never accepted. On the other hand, it is equally clear that if the trust is accepted, though but for a moment, parol proof to show a release of the title to the trust estate cannot be admitted.* Offered as the paper-writing was, not as the release of a vested right, but merely as evidence tending to prove that the signer never accepted the trust created by the deed, no doubt is entertained that the evidence was properly admitted, as it is well-settled law that every conveyance which depends upon the act of the parties is imperfect for vesting the title without the assent of the parties to the same, either express or implied.† Two of the trustees accepted the trust and proceeded to execute it, but it does not appear that the signer of the certificate ever joined with them in any act, either in managing or disposing of the estate. Obviously the weight of the evidence was for the jury, nor does it appear that other testimony to the same point was not introduced, as only so much is reported in the bill of exceptions as was necessary to raise the question of law. Admitted as it was, as a verbal act tending to show that the trust was not accepted, no doubt is entertained that the ruling was correct.

Exceptions were also taken by the defendants to the refusal of the court to instruct the jury as requested, and also to the instructions given in respect to the merits of the controversy. Very great doubts are entertained whether the evidence introduced by the defendants was such that the court would have been warranted in giving the first, second, or third instructions as requested, but the judgment of the court will not be placed upon that ground, as it is clear that the instructions given, if correct, were in all respects suf-

---

* Lewin on Trusts (4th ed.), 150; Robinson *v.* Pett, 3 P. Williams, 251; Doe *v.* Harris, 16 Meeson & Welsby, 517; Doyle *v.* Blake, 2 Schoale & Lefroy, 239; Stacey *v.* Elph, 1 Mylne & Keene, 195; Tiff. & Bull. on Trusts, 532.

† Smith *v.* Wheeler, 1 Ventris, 128.

ficient to dispose of the controversy, and as the verdict was for the plaintiff the only material inquiry remaining is whether the law was correctly given to the jury in those instructions.

Two hundred and twenty-seven thousand four hundred and sixty acres of land were embraced in the patent to Samuel M. Hopkins which was reserved and excepted to prior claimants, and the court, in its fourth instruction, told the jury that the patent did not operate to divest such prior claimants of their title unless they failed to show themselves entitled to the land under the said reservation; that the patent did not pass any legal title to the patentee of said lands, so reserved and excepted by it, where the same had been previously appropriated and granted by the State, inasmuch as it appeared that the patentee got all the lands he paid for or for which he was charged with taxes. What the defendants claimed was that the title under the Gallatin patent was forfeited and merged in the Watson claim under the act of the twenty-seventh of February, 1835, but the jury were instructed that the defendants could not derive any benefit from the supposed forfeiture unless the jury were satisfied that the patent of Hopkins, which was the junior patent, covered and included the land in controversy, and that Watson and those claiming under him were in the actual possession of the said land, claiming the same in good faith, having discharged all the taxes due to the State, duly assessed and charged against the same, from the date of the deed from Hopkins to Watson.

Apart from the merits the defendants set up the statute of limitations, and insisted that the action could not be maintained because, as they alleged, they had " held unbroken and uninterrupted adverse possession of the premises in controversy for a period of fourteen years prior to the institution of the suit." Pursuant to that claim the jury were instructed, in the first place, that the defendants, to sustain that defence, " must have held possession of the premises by residence, improvement, cultivation, or other open, notorious, and habitual acts of ownership, for fourteen years " before

the commencement of the action; but if the jury find that the defendant, Armstrong, resided there and was the owner of a lot in the town of Ripley, and in the immediate vicinity thereof he owned a tract of woodland, part of the land in controversy, from which land, claiming it as his own, he, for the time mentioned, openly cut and hauled his necessary supply of fuel, and also the timber necessary for the construction of various houses on the lot, and also inclosed certain portions of the land, such acts and use are equivalent to adversary possession from the time such acts and use were commenced.

But the evidence showed that the land, on the first day of November, 1836, became forfeited to the State, as matter of law, by the failure of the owners to enter the same upon the books of the Commissioners of the Revenue of the proper county, and pay the taxes properly chargeable thereon, and the court upon that subject instructed the jury that if they so found from the evidence, and that the possession passed into and remained in the State until the title was transferred to the grantors of the plaintiff, the defence under the statute of limitations was not sustained, as the adverse possession acquired by the defendants before the first day of November, 1836, cannot be connected with the adverse possession acquired by them after the grantors of the plaintiff became vested with the title of the State, under the before-mentioned act of the Assembly passed for their relief.

Two principal errors are alleged in the instructions: (1.) That the court did not instruct the jury that the land, when it became forfeited for non-entry on the books of the Commissioners of the Revenue, and for non-payment of taxes and damages, was transferred to and became vested in the owners of the Hopkins patent, under the third section of the act declaring the forfeiture. (2.) That the court erred in the instruction to the jury that the statute of limitations ceased to run when the land became forfeited to the State, and that the period of adverse possession before the forfeiture took place could not be added to the period which elapsed before the suit was commenced, subsequent to the time the title

under the act of the Assembly was conveyed to the plaintiff's grantors, to make the required term of fourteen years to bar the title.

Such a construction of the act of Assembly as the one first claimed, certainly could not have been adopted unless it can be held that the proviso embraced in the Hopkins patent does not afford any protection to the owners of lands included in that survey, where the patents had been previously issued, which is the construction assumed by the defendants. They contend that the proviso only excludes from the operation of the grant the " lands within its exterior boundaries, the titles to which *were inchoate*, and not lands which had been granted by patents previous to the date of that survey and entry," which is a construction not to be sustained if another consistent with the language employed can be adopted better calculated to promote justice and to carry into effect the plain intent of the lawgiver.

On the other hand the plaintiff contends that the reservation excludes from the operation of the patent all lands held by them at the date of the survey, within the exterior boundary of the patent, whether the title was only inchoate or had been perfected by grants, which seems to be the more reasonable construction, and not inconsistent with the language employed.

By the terms of the reservation it is stated that the survey includes two hundred and twenty-seven thousand four hundred and sixty acres beyond the quantity granted to the patentee, in respect to all of which " liberty is reserved that *the same shall be firm and valid*, and may be carried into grant or grants," which means that all shall *be firm and valid*, whether held by complete or incomplete titles, but that such parts as are held by incomplete titles may be carried into grant, and that the patent founded on that survey shall be no bar, in either law or equity, to the confirmation of the titles to the reserved lands included within the exterior bounds of that survey.

Surveys had been made in different parts of the State, subsequent to the treaty of peace, that included smaller

tracts of prior claimants within their exterior boundaries, and which were reserved to such claimants in the certificates granted by the surveyors. Doubts arose as to the authority of the governor to grant patents in such cases, and to remove those doubts the General Assembly, June 2d, 1778, enacted that it shall and may be lawful for the governor to issue grants with reservation of claims to lands included in such surveys, anything in any law to the contrary notwithstanding.* Prior to the passage of that law the authority to issue such grants was at least doubtful, even if the power existed at all, and it is clear that the Assembly never intended that any such grant should cover any prior title, whether complete or incomplete, within the exterior boundaries of the survey.† Supported as the proposition is by repeated decisions of the State court it is adopted without hesitation, as any other rule would work very great injustice.‡ Where the exterior boundaries of a survey under that law upon which a patent is founded includes tracts belonging to prior claimants, the patentee cannot in such a case recover in ejectment without showing that the tract claimed by the defendant is not within the bounds of the excluded claims, which is a direct authority that the reserved lands in a case like the present did not pass to the patentee.§ Even more decisive also is the case of *Nichols et al.* v. *Covey*;‖ in which it is determined that where a patent is issued in pursuance of the act of the second of June, 1788, which includes in its general courses a prior claim, it does not pass to the patentee the title of the State to the lands covered by such prior claim. On the contrary, the title of the patentee in respect to such a tract is not only subject to the title of the prior claimant, but if that title is only a prior entry and it becomes vacated by neglect to procure a survey and return the plat, any one may lay a warrant on the same, as in other cases of vacant and unappropriated lands. Exactly the same

---

* 2 Revised Code of Virginia, 434.    † Ib. 350, 433; Ib. 365.

‡ Hopkins et al. *v.* Ward et al., 6 Munford, 38.

§ Madison *v.* Owens, 6 Littell's Select Cases, 281.

‖ 4 Randolph, 365.

rule is laid down by this court in the case of *Scott et al.* v. *Ratliffe et al.,** in which the opinion was given by the Chief Justice. He said such patents have been always held valid, so far as respects the land not excluded, but to pass no legal title to the land excepted from the grant, as the lands are in this case in the *habendum* of the patent, and not a doubt is entertained that the rule there laid down is the correct rule upon the subject.†

2. Sufficient evidence was introduced by the defendants to show that they or some of them took adversary possession of the premises in controversy prior to the forfeiture of the same to the State, and that they continued to occupy the same throughout the period that the title was vested in the State, and after the State conveyed the tract to the grantors of the plaintiff to the time when the suit was instituted, but it is conceded that such adversary possession before the forfeiture was not for the period of fourteen years, the time then required by law to bar a recovery, nor did such adversary possession subsequent to the date of the conveyance by the State to the grantors of the plaintiff and before the service of process, continue long enough to bar a recovery. Both combined would maintain the defence, and of course if the statute continued to run during the period the title was vested in the State by the forfeiture, the instruction given to the jury was erroneous and the judgment must be reversed. Adverse possession was the defence in the case of *Stoughton* v. *Baker,*‡ where the question arose in respect to the right of the defendant to an ancient grant which was subject to an implied limitation, and it was contended that he had been so long possessed of the premises that the State had no right to interfere in any form of legal remedy. Possession and uninterrupted enjoyment for a very long period was proved in that case, but the court held that the limitation could not be extinguished by any inattention or neglect

---

* 5 Peters, 86.

† Kenna *v.* Quarrier, 3 West Virginia, 212; Hardman *v.* Boardman, 4 Leigh, 382.

‡ 4 Massachusetts, 526.

in compelling the owner to comply with it, for no laches is to be imputed to the government and against it no time runs so as to bar the public rights, which is no more nor less than another form of words for expressing the ancient rule of the common law, that time does not run against the State.*

Argument to show that the statute of limitations ceased to run when the forfeiture attached and the title became vested in the State can hardly be necessary, as the rule that time does not run against the State has been settled for centuries, and is supported by all courts in all civilized countries.† Suppose that is so, still it is insisted that the two periods, that is, the period of adverse possession before the forfeiture and the period subsequent to the conveyance by the State to the plaintiff or those under whom he claims, may be added together and considered as one entire period, for the purpose of maintaining the defence, and it is clear if that proposition is correct the instruction given was erroneous. But the proposition cannot be admitted, as it is well-settled law that the possession, in order that it may bar the recovery, must be continuous and uninterrupted as well as open, notorious, actual, exclusive, and adverse.‡ Such a possession, it is conceded, "if continued without interruption for the whole period which is prescribed by the statute for the enforcement of the right of entry, is evidence of a fee," and bars the right of recovery. Independently of positive statute law such a possession affords a presumption that all the claimants to the land acquiesce in the claim so evidenced and enforced, or that they forbear for some substantial reason to controvert the claim of the possessor or to disturb him in the enjoyment of the premises. Secret possession will not do, as publicity and notoriety are necessary as evidence of notice and to put those claiming an adverse

---

* United States v. Hoar, 2 Mason, 312; Lindsey et al. v. Miller, 6 Peters, 673.

† Angell on Limitations, 5th ed 28.

‡ Cook v. Babcock, 11 Cushing, 210.

interest upon inquiry.* Mere *occupation* is not sufficient, but the possession must be *adverse*, as seizin and possession are supposed to be coextensive with the right, and that the possession continues till the party is ousted thereof by an actual possession in another under a claim of right.†

Continuity of possession is also one of the essential requisites to constitute such an adverse possession as will be of efficacy under the statute of limitations.. Whenever a party quits the possession the seizin of the true owner is restored, and a subsequent wrongful entry by another constitutes a new disseizin, and it is equally well settled that if the continuity of possession is broken before the expiration of the period of time prescribed by the statute of limitations, an entry within that time destroys the efficacy of all prior possession, so that to gain a title under the statute, *a new adverse possession* for the time limited must be taken for that purpose.‡

Beyond all question the case of *Hall* v. *Gittings*, one of the cases just cited, presented the same question as that involved in the case before the court, and the decision was that the forfeiture to the State within the period necessary to give effect to the statute did have the effect to break the continuity of adverse possession, and prevented the operation of the statute bar.§

Viewed in any light the court is of the opinion that there is no error in the record.

JUDGMENT AFFIRMED.

Mr. Justice STRONG, with whom concurred Justices DAVIS and BRADLEY, dissenting.

In the view which a majority of my brethren take of one branch of this case, I am unable to concur.

The plaintiff in the court below claimed title to the land

---

* Bradstreet *v.* Huntington, 5 Peters, 402; Blood *v.* Wood, 1 Metcalf, 528; Ewing *v* Burnet, 11 Peters, 53.

† Angell on Limitations, 377; Clarke *v.* Courtney, 5 Peters, 354; McIver *v.* Ragan, 2 Wheaton, 29; Kirk *v.* Smith, 9 Id. 288.

‡ Brinsfield *v.* Carter, 2 Kelly, 143; Ringgold *v.* Malott, 1 Harris & Johnson, 316; Hall *v.* Gittings, 2 Id. 112.

§ Taylor *v.* Burnsides, 1 Grattan, 190.

in controversy under a patent of the State of Virginia, granted to Albert Gallatin on the 10th day of February, 1786. It does not appear that any possession was ever taken under this patent, but on the 1st of November, 1836, the lands were forfeited to the State for failure by the owners to make entry thereof upon the commissioners' books, for taxation. On the 12th of February, 1844, however, an act of the legislature was passed for the relief of Dundas and Kugler, who had become the grantees of the Gallatin right, by which they were allowed to redeem the lands, on the payment of all taxes and damages due thereon, and on the 8th day of May, 1845, the redemption was made. The plaintiff has no other title.

The defendants claim as grantees by sundry mesne conveyances through James T. Watson from Samuel M. Hopkins, who also obtained a patent from the State, dated July 1st, 1796.

I agree that neither this patent to Hopkins, nor any legislation of the State affecting it, presents any sufficient defence to the claim of the plaintiff under the earlier patent to Albert Gallatin. But the defendants set up in the court below another defence. It was that they were protected by the statute of limitations. They submitted evidence tending to prove that they, or those through whom they claim, took actual and adversary possession of the lands in 1827, and that such possession had been continued until the institution of this suit. Relying upon this, they presented to the court the following two points (among others), and requested that they might be given as instructions to the jury:

"*Fourth.* If the jury are satisfied from the evidence that adversary possession commenced before the 1st of November, 1836, and the same possession continued during the time of the forfeiture, as well as from the 8th of May, 1845, the time of redemption, up to the time of the institution of this suit, and by adding the time of adversary possession before forfeiture to the adversary possession after redemption makes a period of fourteen years, then they must find for the defendants, or such of the defendants as make out the fourteen years as aforesaid.

" *Fifth.* That the act of 1844, which authorized Dundas and Kugler to redeem the lands therein specified, did not so operate as to relieve them from the effect of the statute of limitation, which had commenced running for the defendants before the forfeiture, if the jury believed the defendants continued their possession without interruption during the forfeiture, and up to the time of redemption, and that the defendants continued the possession up to the time of the institution of this suit."

Both these points the court refused to affirm, and, on the contrary, charged the jury that on the 1st of November, 1836, the possession of the defendants terminated and passed into and remained in the Commonwealth until the same was transferred to Dundas and Kugler by the act of February 12th, 1844, and that the adverse possession acquired by the defendants before November 1st, 1836, could not be connected with the adverse possession acquired by the defendants after Dundas and Kugler became revested with the title of the Commonwealth. Herein, I think, was clear error. Plainly, had there been no forfeiture, the adversary possession of the defendants, kept up continuously during fourteen years, would have protected them against any right of entry by the plaintiff. The forfeiture did not disturb their actual possession, nor their possession under claim of exclusive right in themselves, which is what is meant by adversary. I agree that their possession between the forfeiture and the redemption gave them no right as against the State. This is not because their possession was not adversary, nor because the actual possession was transferred by law to the Commonwealth, but because adversary possession is unavailing to bar any rights of the State, it not being subject to statutes of limitation, unless expressly named. The defendants here are not asserting their adversary possession against the State. The controversy is between them and one claiming under the Gallatin title, which, though at one time forfeited to the State, was allowed to be redeemed. They claim nothing against the State on account of their possession from November 1st, 1836, to May 8th, 1845, though it was

adversary and uninterrupted, either by abandonment or by the entry of the State or of the plaintiff.

But why is not that possession operative against the plaintiff? I think it is. As between him and the defendants, nothing but an entry or an action brought was sufficient to change the character of their possession or break its continuity. It is not, however, necessary to discuss this. It is sufficient for this case that the defendants held actual and continuous possession of the lands from 1827 until 1857, when this suit was brought; that the possession was always adversary to the plaintiff; that he never took any steps to disturb it, and that he has had more than fourteen years within which he might have asserted his right.

Concede that the plaintiff's right of entry was suspended by the forfeiture, still it revived when the lands were redeemed, and if the defendants' possession was adverse to his right, and continuous during fourteen years in which he might have entered or asserted his right by action, I am unable to perceive why he is not barred.

The fact that an owner's right of entry has been suspended, after the statute has commenced running against him, can be of no importance, if he has had the statutory period within which to bring his action against the disseizor in adverse possession. If this is not so, then war might not only suspend the running of the statute, but render of no effect all adverse possession held before the war commenced. This has never been asserted. It is the uninterrupted, adverse possession alone which creates the bar. It is not essential to it that the right to enter or to bring suit should have suffered no interruption.

Every reason for applying the statute, which would have existed had there been no forfeiture, and consequently no suspension of the plaintiff's right to enter, exists in full force now. Statutes of limitation are dictated mainly by two considerations: one, that it is public policy to discourage stale claims; and the other, that it is not to be presumed that one having a right would delay asserting it for a long period in full view of another's wrongful interference with

it.   Hence, the period was fixed at fourteen years, in Virginia and West Virginia, within which a party out of possession may bring his action of ejectment against one in possession holding adversely.   Assuming that the jury would have found the facts as stated in the points proposed, the plaintiff has had that entire period, and the public policy, as well as the presumptions arising from his laches, which gave birth to the statute, apply, in all their potency, to his case. And the statute is not only a bar to the assertion of a right of entry upon one in adverse possession after the expiration of the period fixed, but it gives a title to the disseizor.   The law casts title upon him, and assures to him the privilege of asserting it, either aggressively or defensively.   For the acquisition of this right the defendants have done all that the law contemplates.   They entered under a claim of exclusive right, that is, adversarily, and they held that adversary possession continuously until this suit was brought.   That the Gallatin title was forfeited during their occupancy was no fault of theirs.   It was due to the wrongful neglect of the plaintiff, or those under whom he claims, to enter the lands upon the commissioners' books, and to pay the taxes.   Can he now make use of a forfeiture, caused by his own neglect, to obtain or preserve rights which, confessedly, would have no existence but for his neglect?   Yet this was, in substance, the instruction given to the jury.   His laches, resulting in a forfeiture, is to have the same effect as an entry would have had, or as action brought.   Thus he is allowed to secure an advantage through his own default.   Thus he is allowed to make use of his own unlawful nonfeasance to break the continuity of the defendants' hostile possession.   I cannot assent to such a view of the law.

Had the Commonwealth, after the forfeiture of the Gallatin title, granted the land to some other grantee, I agree that such grantee would not be affected by any adverse possession of the defendants held by them before the forfeiture, of less duration than fourteen years.   But such was not the case.   The holders of the Gallatin title were allowed to *redeem*.   The nature of the transaction by which they became

Opinion of Strong, Davis, and Bradley, JJ., dissenting.

reinvested with the title is plainly seen in the act of February 12th, 1844, passed for their relief. Its preamble recited that the lands had become forfeited by reason of failure to enter the same on the books of the Commissioners of the Revenue for taxation, and that Dundas and Kugler, the trustees of the North American Land Company, for whose use the title had been held, had petitioned for permission to "*redeem*" said lands, on payment of the taxes assessed, together with six per centum per annum damages thereon. The first section authorized them to "*redeem*" on those terms, on or before June 1st, 1845. The second section "*released*" unto them, for the benefit of the shareholders of the company, all the right, title, and interest which had been forfeited upon the payment of said taxes and damages. The third section authorized a judgment against the lands for the amount of costs incurred, and for reasonable compensation to any commissioner of delinquent and forfeited lands by reason of his having prepared the redeemed lands for sale; and the fourth section directed all proceedings by such commissioners to be suspended until after June 1st, 1845. It thus appears that the redemption was not the acquisition of a new title. It was the common case of a waiver of a forfeiture. Dundas and Kugler, after the redemption, held by their old right, the Gallatin patent, and it was this right which the plaintiff gave in evidence and asserted in the present action. No new patent was issued to Dundas and Kugler. The act of 1844 contains no words of grant to them, and its avowed purpose was to place them in the same position, as holders of the title and trustees of the company, which they occupied before the forfeiture.

I am, therefore, of the opinion that the Circuit Court erred in refusing to affirm the defendants' fourth and fifth points, and also in the instruction which was given to the jury respecting the effect of the statute of limitations. For this reason I think the judgment should be reversed, and that a *venire de novo* should be awarded.