JOSEPH J. SHEARER v. EDWARD MIDDLETON.

*Pleading—Amendment of declaration—Overflowing lands—Evidence—Adverse possession.*

1. Where in a flowage case the cause of action set forth in the declaration is the maintenance of a dam and the consequent obstruction of the flow of the waters of a stream, which are thereby set back and made to overflow plaintiff's land, an amendment alleging that the water upon plaintiff's land, which is low and wet, is held back and kept on the land by reason of the maintenance of said dam, to the injury of the land, does not introduce a new cause of action, but alleges an additional injury from the same cause, and is properly allowed, after the close of the testimony, to cover the proofs in the case.

2. In order to show that the defendant had raised his dam, and thereby increased the flowage upon plaintiff's land to its injury, the plaintiff was permitted to show the relative capacity of a grist-mill operated by the defendant prior to said increased flowage, the grinding in which was done with stones, and of a roller-mill erected by the defendant 300 or 400 feet below the old mill, under the claim that the jury might infer that the increased capacity of the new mill was obtained by raising the dam. No proof was made that the defendant had used his full power when operating the old mill, and it appeared that he only owned one-half of the water-power created by the dam at that time, and had since then acquired the entire power, which was used in running the new mill; nor was it shown that the same wheels and machinery were in use, nor that it would require a greater head of water to run the roller-mill, nor that defendant had not acquired a greater head standing in the same level of the pond by locating the new mill further

88 621
101 529
88 621
104 33
88 621
105 188
88 621
113 190
88 621
136 263

down the stream. And it is held that, in the absence of the necessary *data* raising the conclusion that the dam was necessarily raised when the capacity of the mill was increased, the evidence first referred to was misleading and entirely unreliable, and should not have been admitted for the purpose claimed.

3. There are many ways in which an adverse holding of land may be interrupted other than by bringing suit; citing *Perkins v. Blood*, 36 Vt. 273; *Armstrong v. Morrill*, 14 Wall. 120; *Byrne v. Lowry*, 19 Ga. 27; *Borel v. Rollins*, 30 Cal. 408; *Warren v. Putnam*, 68 Wis. 410; *Gage v. Gage*, 30 N. H. 420; *Burrows v. Gallup*, 32 Conn. 493; *Brickett v. Spofford*, 14 Gray, 514.

4. The actual, continued, visible, notorious, and hostile possession of land is tantamount to a claim of ownership.

5. Certain of defendant's requests to charge are held to have been covered by the general charge of the court.

Error to Montcalm. (Smith, J.) Argued November 20, 1891. Decided December 21, 1891.

Case. Defendant brings error. Reversed. The facts are stated in the opinion.

*Ellsworth & Rarden* and *John Lewis*, for appellant.

*W. E. Hoyt*, for plaintiff.

CHAMPLIN, C. J. In this case it is claimed by the plaintiff and conceded by the defendant that the plaintiff has been the legal owner of the lands described in the declaration for more than 15 years last past, and that he is still the legal owner of said lands.

It is claimed on the part of the defendant that he has acquired the right to flow such lands by prescription, by flowing the same in the same manner and to the same extent for more than 30 years last past; that immediately prior to the commencement of this suit the defendant had occupied the lands by flowage for more than 15 years openly, adversely, peaceably, uninterruptedly, and hostilely, and thereby acquired a good and

legal title to so much thereof as he occupied at the time of the commencement of the suit.

The plaintiff claims that within the 15 years immediately prior to the commencement of the suit the defendant raised the water at his dam, and flowed more of said lands than formerly; and the real issue on the trial was whether the defendant had raised the head of water at his dam below said lands, and thereby increased the flowage of water over the lands of the plaintiff, within 15 years immediately prior to the commencement of the suit.

After the testimony was closed, and after the plaintiff's attorney had made his opening argument to the jury, and after Mr. Lewis, on behalf of the defendant, had made his argument to the jury, Mr. Ellsworth, of counsel for the defendant, moved the court for a verdict for the defendant, because the declaration only alleged that the waters of Flat river were forced back on the plaintiff's lands, and claimed the evidence showed that the waters of Flat river were not forced back there; which motion was overruled by the court, to which ruling the defendant excepted. The court then permitted the counsel for plaintiff to amend his declaration so that it would allege, in addition to the allegations therein contained, that the water upon the lands of the plaintiff is held back and kept there by reason of the maintenance of the dam of the defendant, and his land injured thereby; to which ruling the counsel for defendant excepted.

The original declaration alleges, after setting up the maintaining of the dam across the Flat river, that "by means thereof the said defendant hath, ever since the 14th day of February, A. D. 1882, obstructed and stopped the natural course of the water of the said stream, and thereby hath caused the water of the said stream to

overflow and drown the plaintiff's meadow and arable
lands." The amendment was allowed to cover the facts
in proof that the land of plaintiff was low and wet, and
that water from said land was drained into Flat river
before the dam was raised, and that the effect of such
raising of the dam was to hold this water back, and to
prevent it from running off. It was an incident of the
wrong complained of in the original declaration,—that is,
the obstructing of the waters of Flat river by the dam.
It was not the introduction of a new cause of action.
The cause of action was the maintaining of a dam and
obstructing the flow of the waters of Flat river, and
causing them to set back, to plaintiff's injury. The
amendment alleged an additional injury from the same
cause. The assignment of error based upon this ruling
of the court is overruled.

The court permitted the plaintiff to introduce testimony
which tended to show that the mill-dam was erected,
and the waters of flat river ponded thereby, for the
purpose, among other things, of operating a grist-mill
owned by defendant, and that the dam had been main-
tained at that point for milling purposes for more than
20 years. It was an undisputed fact that during all the
time the dam had been erected it had set back and
ponded the water upon the premises of plaintiff, and
upon premises further back from the river than his;
but the plaintiff claimed, and introduced testimony tend-
ing to show, that within fifteen years last past the water
had been raised by the defendant and set back over the
land of the plaintiff to a greater extent than formerly.
It appears that the mill operated by defendant down to
1871, which was more than 15 years before the com-
mencement of the suit, was a grist-mill, in which stones
were used to grind the wheat and other grain. That
year he built a new mill, from 300 to 400 feet further

down the river than the other mill, and nearly 50 rods distant from the dam, and dug a race from the same bank to the new mill, and then put in rollers to manufacture flour for market, increasing the capacity of his mill, from time to time, by the addition of new rollers. The plaintiff did not prove any direct act of defendant in adding to the height of his dam, but sought to establish that fact by proving that the water overflowed his land to a greater extent than formerly; and he testified that such increased overflow had occurred within 10 years before the suit brought. For the purpose of proving that the defendant had raised the height of his dam he was permitted to introduce testimony, against defendant's objection, to show what the capacity of defendant's grist-mill was when he was grinding with stone, and also what it is with rollers, and claimed that the jury would be authorized to draw an inference from such increase of capacity that defendant obtained such increase of capacity by raising his dam and so increasing his water-power. The plaintiff did not show that the defendant had used his full power when grinding with stone,—indeed, it appeared that at that time he owned only one-half of the water power created by the dam, and that he has since acquired the whole power created thereby; nor did he show that the same wheels were in use, nor the same machinery, nor that it would require a greater head to run his roller-mills than it did when using stone, nor that he had not acquired a greater head of water standing in the same level of the pond by moving his mill further down the river. It is plain that such testimony, without supplying all the necessary *data* by which the conclusion could be reached that the dam was necessarily raised when he increased the capacity, was misleading, and

entirely unreliable, and should not have been submitted for the purpose claimed.

Henry M. Calkins was a witness whom plaintiff had produced to establish the fact of water having been raised so as to overflow more of plaintiff's land than formerly. Calkins was a surveyor, and testified when first called to the stand, that he had made surveys of the premises, and produced a map which he had made, and which was introduced in evidence. He also testified that he had a high-water mark at the flume when defendant had a full head of water, and also a corresponding mark at a bridge which was on or near the plaintiff's land; and in this way he could tell when the water was drawn down in the pond.

A witness introduced by defendant, who worked for him in his old mill from 1861 to 1864, testified in chief to the high-water mark in the flume at that time, and said he could not see that it is maintained any higher than it was then. On cross-examination by plaintiff's counsel he was interrogated as to the numer of feet head, and said that sometimes they had eight feet head and sometimes a little more, but the ordinary high-water mark was eight feet; and he did not know how many feet head they had now. The defendant introduced no testimony to show what head they had at the old mill, nor at the new mill.

After the defendant had introduced his testimony and rested, the plaintiff recalled the witness Calkins, and proposed to show what measurements he had made at the Middleton dam, with reference to determining the head of water. This was objected to by defendant's counsel, and the record then shows as follows:

"*The Court:* Why wasn't that a part of your case, Mr. Hoyt?

"*Mr. Hoyt:* We claim we made our case when we showed that the water had been flowing upon our land, that the water had been raised in the pond above the dam, and that Middleton was maintaining a dam now. They met that case by undertaking to show that, if the water had been raised upon this dam, it was no fault of theirs, because this dam had not been raised; and they bring different witnesses here—innumerable witnesses here —to show that the dam had not been raised, that the water had not been raised above the dam, in all these years Middleton had owned it; and Mr. Charles Middleton and these other men that have worked about the mill all testify that the dam had not been raised. We propose to show that within the last 15 years, at some time, they have raised the dam.

"*The Court:* When? About what time?

"*Mr. Hoyt:* Since the time that miller worked there from Mt. Pleasant.

"*The Court:* You know something about it, do you, or don't you?

"*Mr. Hoyt:* It has been raised gradually. It has not been raised all at one time. We can't show that. We can't show that Mr. Middleton commenced at some time in the spring of 1875, or any other spring, and kept to work on that dam until he got it maintained any higher than it was before; but we do expect to show that gradually this dam had been raised, until now he is carrying something like two feet greater head than he was at any time before.

"*The Court:* Do you expect to show how that the head had to be raised so as to flow the water back more than it did before within the last 15 years?

"*Mr. Hoyt:* That would be the only conclusion that any man could arrive at if the water had been raised two feet.

"*The Court:* Will you answer my question; do you expect to show that?

"*Mr. Hoyt:* We expect to show that.

"*The Court:* That answers my question. I am inclined to let you show it if you can."

The witness then testified that he had made measurements in July and since as to the head. He was then asked:

"*Q.* You have those measurements. How much head do you say they have?

"*A.* I don't understand the technical definition of the word 'head,' as millers use it, but I found a difference of ten feet and two inches between the ordinary high water in the pond and the water immediately below the dam, when they were running the mill. I know the slash-boards at the head of the chute; the difference in height between where they formerly stood and where they stand now is about two inches,—one inch to an inch and a half lower."

This testimony was not in any sense rebuttal. No witness of defendant had testified as to the height of the dam, or to the difference in level in the surface of the water above the dam and immediately below. Besides, such testimony did not tend to show that the head of water had been increased by raising the dam. The witness did not seem to know what is meant by the word "head," as applied to water-power in moving water-wheels. I had supposed that it is a matter of common knowledge that the signification of the term when water is applied to such use is the vertical distance between the water in a flume or place from whence it is drawn to the tail-water of the wheel by which the power is communicated to the machinery; and, unless it was shown that the water at the bottom of the dam is on the same level as the tail-water of the wheel, it would afford no evidence of the "head." If the tendency of such testimony was to prove that the height of the dam had been increased gradually for several years, it was testimony which should have been introduced by plaintiff in the first instance in support of his issue. This witness was placed upon the stand by plaintiff to support the issue upon his part, and it is not claimed that counsel for plaintiff did not know of facts he could prove by the witness at that time, or that it had escaped his memory, or that he had failed to call out the facts through inadvertence. Such testimony was not only not rebutting, but it was misleading.

The court erred in striking out the testimony of Jerome Lufkin, wherein he testified that he had land adjoining the plaintiff's and that the water from defendant's pond set back onto his lands, and that timber grew there in the water,—some quite small trees, and some quite large trees,—and that some trees are growing there now like the tree brought into court by the plaintiff. The plaintiff had introduced in evidence by the witness McIntyre a stub of a small tree which had grown on plaintiff's land, now covered with water, for the purpose of establishing the fact, based upon his theory that timber could not grow in water, that therefore the water must have been raised upon plaintiff's land by defendant's dam after the tree had grown, some 10 or 15 years previous. The testimony of this witness for defendant was offered to dispel the theory of plaintiff by showing that like timber in size and quality was growing on the witness' land, all the time covered with water, and land, too, adjoining the land of the plaintiff. The testimony should have been admitted upon the same theory as the plaintiff's testimony was, as showing the effect of water upon the standing timber.

Error is assigned for the reason that the circuit judge did not give the third request of the defendant's counsel, which reads as follows:

"I also charge you that, when adverse, open, peaceable, and notorious possession of land has once commenced, under our statute of limitations nothing less than suit would interrupt the right or prevent such occupancy from ripening into a perfect title to the same after the lapse of 15 years, provided such adverse, open, peaceable, and notorious occupancy has continued uninterruptedly for that space of time, since 1863."

The fault with this request is that it confines the interruption of an adverse holding to the bringing of an action, whereas there are many ways in which such

adverse holding may be interrupted other than by bringing suit. See *Perkins v. Blood*, 36 Vt. 273; *Armstrong v. Morrill*, 14 Wall. 120; *Byrne v. Lowry*, 19 Ga. 27; *Borel v. Rollins*, 30 Cal. 408; *Warren v. Putnam*, 63 Wis. 410 (24 N. W. Rep. 58); *Gage v. Gage*, 30 N. H. 420; *Burrows v. Gallup*, 32 Conn. 493; *Brickett v. Spofford*, 14 Gray, 514.

Error is also assigned for not giving defendant's tenth request, as follows:

"I further charge you as matter of law that the height of defendant's dam, and the height to which he has usually kept the water raised in said dam, for 15 years prior to the commencement of this suit, fixes and establishes his right to flow the lands of the plaintiff as thus flowed, if so flowed at all; and if the defendant has, during any period of 15 years, since the year 1863, kept the water at his dam usually as he did at about the commencement of this suit, then the plaintiff has no cause for complaint under the laws of the State, and you should find a verdict for the defendant."

We think this request is covered by the following instructions given by the court to the jury:

"If you conclude from the evidence in the case that the plaintiff has shown that his land has been flowed because of the maintenance of this dam, then the plaintiff is entitled to recover his actual damages running back six years before the commencement of this suit, unless the defendant has acquired right to use the land as he is using it because of his long continued possession—actual, open, adverse, and uninterrupted use or possession —of the same. Now, in order to acquire prescription, it is not necessary that a man have the paper title of it before commencing to use it. Our own Court uses this language: 'Our statute does not require adverse possession to be based on color of title.' It requires only that it shall continue for the requisite time after the right of action accrues against the possessor. It may become perfect therein, though in its origin the possessor has no shadow of title. In such cases it must be made clear that the real owner has been given a cause of action.

"The basis of acquiring a title by prescription is that

one man goes on the land of another, or uses it in some way as owner, claiming it as his own, uses it adversely, in hostility to the rights of the other, openly, adversely, uninterruptedly, and peaceably for the required time under the statute, and the other party acquiesces in that; if he has a right of action, and fails to bring it for this required time, then the law steps in and says that 'you can't dispute the question. He has got the land. It is his just the same as though he had a grant, if that is true.' So the second question is, has the defendant actually, adversely, peaceably, openly, and uninterruptedly had possession of this land, or flowed the same, so that now the plaintiff has no cause of action?    *    *    *

"I say to you, gentlemen of the jury, that 15 years adverse, open, peaceable, notorious, hostile, and uninterrupted possession of land by flowage gives to the person so flowing the land a right to flow the same, and a right so acquired is, under our statute, equally as good as if done by authority. I further instruct you that such possession of land by flowing, there not being any color of title, not under any deed or any other paper title,— that possession which is adverse, open, visible, notorious, and uninterrupted for the period required by the statute, —is all that is necessary to make complete defense for the defendant in this case."

Defendant's thirteenth request is in the following language:

"I also charge you that, if you find that the defendant has caused the waters of Flat river to overflow the lands of the plaintiff, and also find that he (defendant) has not so flowed said lands for 15 years continuously after 1863, and before the commencement of this suit, even then you cannot guess at the damage sustained by the plaintiff at such flowage, and could only render a verdict for damages for such an amount as was actually proven, and you have no right to base a verdict on a presumption or guess."

This request is sufficiently covered by the instruction of the court as follows:

"Now, gentlemen, if under these instructions you conclude that the plaintiff should recover, then comes the question as to what should be the damages. You could

only go back for the period of six years prior to the commencement of 'suit, and the suit was begun in February, 1888. And that measure of damages would be, how much damage that would be,—the rental value of the land that he has been deprived of. Where he was only partially deprived of it, then the extent of the injury that he has sustained, that would be the measure of damages that he should recover, if he recovers at all. And so all the evidence bearing upon that point would be proper for you to consider, what the witnesses tell you the use of the land is worth, and the extent—how much—it has been injured."

A criticism is made upon the language of the court in his instruction defining adverse possession, wherein he says, "claiming it as his own." This was not error. The same idea is embraced in the term "hostile and exclusive," as applied to possession. The actual, continued, visible, notorious, and hostile possession is tantamount to a claim of ownership; and in this case, if defendant had raised the water by his dam so as to overflow plaintiff's land continuously for 15 years, as claimed by the defendant, without objection from the plaintiff, it would be sufficient notice to plaintiff, not only that he so held it hostilely, but under a claim of ownership, for it could not be otherwise than visible, notorious, and hostile as against the plaintiff.

For errors in the admission of testimony the judgment must be reversed, and a new trial had.

The other Justices concurred.