KING v. HATFIELD et al.

(Circuit Court, D. West Virginia. December, 1900.)

1. FORFEITURE—ENTRY OF LAND FOR TAXATION—CONSTRUCTION OF STATE CONSTITUTION.

Section 6, art. 13, of the Constitution of West Virginia provides: "It shall be the duty of every owner of land to have it entered on the land books of the county in which it, or a part of it, is situated, and to cause himself to be charged·with the taxes thereon, and pay the same. When for any five successive years after the year 1869, the owner of any tract of land containing one thousand acres or more, shall not have been charged on such books with state tax on said land, then by operation hereof, the land shall be forfeited and the title thereto vest in the state. But if, for any one or more of such five years, the owner shall have been charged with state tax on any part of the land, such part thereof shall not be forfeited for such cause. * * *" Held: That this provision does not apply to land that was on such landbooks and charged with taxes in the name of the owner at the time said Constitution was adopted. Such land, or any land that was entered and charged with taxes upon such landbooks in the name of the owner within the five years next after the year 1869, does not become forfeited by consequence of any subsequent omission of the land or noncharging of state taxes.

2. SAME—DUTY OF OWNER, WHEN FULFILLED—OWNER HAS NO CONTROL OF LAND ONCE ENTERED ON LANDBOOKS—NO FORFEITURE FOR FAILURE OF PUBLIC OFFICERS TO ENTER AND CHARGE LAND.

When land has once been entered upon the landbooks in the name of the owner, his duty with regard to entering it has been fulfilled. He has no control over the entering and charging of such land with taxes thereafter, or over the taxing officers. The land can only be omitted by such officers, and no forfeiture thereof can result from their failure to enter it and charge it with taxes. But if said section 6, art. 13, Const. W. Va., be construed to make it the duty of the landowner to have his land entered upon the landbooks whenever for any cause it may be omitted therefrom, and land has been sold to the state at a delinquent tax sale, and is afterwards redeemed by the owner in a proceeding instituted on behalf of the state in the circuit court of the state to dispose of the land, and the decree of redemption entered upon his petition to redeem directs the clerk of the court to certify copies thereof to the auditor and taxing officers, such owner has done all that is reasonably in his power to have the land re-entered and charged with taxes, in the absence of authority to make the entry·and charge in person, and of any statutory direction as to how to "have" it done; and no forfeiture of said land can accrue because the land is not re-entered upon the landbooks and charged with taxes.

3. SAME—CONSTITUTIONAL LAW—VESTING OF TITLE OF ONE PRIVATE PERSON IN ANOTHER—DUE PROCESS OF LAW—FOURTEENTH AMENDMENT.

Section 3 of article 13 of said state Constitution provides that: "All title to lands in this state * * * hereafter forfeited, not redeemed, re-

leased or otherwise disposed of, vested and remaining in this state, shall be, and is hereby transferred to, and vested in" certain classes of persons, if any such there be, for so much of said land as is claimed by them adversely to the person in whose name the same was forfeited, under certain specified conditions. A statute of the state provides for the redemption of land forfeited to the state in a suit to be brought by the state against the former owner for the purpose of selling such land for the benefit of the school fund, but requires such suit to be dismissed as to any land held under said section 3, if, during the pendency of such suit, it shall appear that it is so held; and provides that any redemption that may be had in such suit shall not affect the title of any person holding under said section. *Held*, that as to land purporting to be forfeited under section 6 of said article 13 by reason of the noncharging of state taxes thereon, and falling under the provisions of section 3, construed to operate in futuro, the attempted forfeiture is not through the instrumentality or aid of a judicial proceeding, but without it, and by the operation of the Constitution alone, and is an attempted transfer by the state of the property of one private person, without his consent, to another private person, for his private benefit, by mere legislative action, and not by "due process of law," and is repugnant to the fourteenth amendment, and is invalid and inoperative.

**4. SAME.**

The Constitution of West Virginia and the statutes of that state, so far as they purport or undertake to forfeit and divest the title of any person to his land and vest the same in another private person, or vest the same in the state without provision for redemption by or on behalf of the owner of the whole or such part of said land as he may desire to redeem, or without provision for a sale thereof and the return of the proceeds to such owner after deduction of all taxes and all proper charges therefrom, attempt to deprive persons of their property without due process of law, and are in contravention of the fourteenth amendment to the Constitution of the United States. There can be no valid forfeiture where such right of redemption or receipt of proceeds is prohibited or not provided for.

**5. SAME—CLASS LEGISLATION.**

Said provision of the state Constitution in attempting to forfeit tracts containing 1,000 acres or more, and not tracts containing less than 1,000 acres, makes an unreasonable classification and discrimination, and is repugnant to the equality clause of the fourteenth amendment to the Constitution of the United States, and is invalid.

**6. SALE OF LAND NOT SUBJECT TO SALE BY STATE.**

An ex parte proceeding in the circuit court of the state by a commissioner of school lands for the sale of land as waste and unappropriated which is not waste and unappropriated, nor forfeited, nor otherwise subject to sale by the state, is coram non judice, and a sale and deed made thereunder are void.

(Syllabus by the Court.)

Maynard F. Stiles, for complainant.
Henry C. Flesher, for defendants.

JACKSON, District Judge. This is a suit to set aside and remove clouds upon complainant's title to portions of a tract of land claimed by him. The case is now heard upon the bill and demurrer.

The complainant claims a tract of 500,000 acres of land under a grant issued to Robert Morris by the commonwealth of Virginia June 23, 1795, and under mesne conveyances from the grantee to the complainant, which tract is situated partly in the state of West Virginia, in Logan, Mingo, Wyoming, and McDowell counties. He files as

exhibits with his bill title papers which show a regular chain of conveyance to him, and alleges that he is in actual possession of said tract. He also files as exhibits copies of two patents—one for 450 acres, and one for 330 acres—issued to Aly Hatfield, now deceased, by said commonwealth, in 1859, and of three deeds from the commissioner of school lands of Logan county to Joseph Hatfield, now deceased, for tracts of 72, 48, and 140 acres, respectively, executed in the years 1884, 1888, and 1889, under proceedings on behalf of the state of West Virginia for the sale of waste and unappropriated land of the state. The defendants claim these tracts by inheritance, but have had no possession of them. Upon the face of the bill it is apparent that the title to the land in dispute is in the complainant, and that the muniments of title under which the defendants claim confer upon them no right whatever, unless the complainant has lost his title thereto by forfeiture of his land for nonassessment of taxes under the provisions of the Constitution of West Virginia, and by virtue of such forfeiture that title has become vested in the defendants, as the defendants claim.

It appears from the bill that by virtue of certain conveyances made by John Peter Dumas, who, as trustee for the creditors of James Swan's estate, was the owner of the Morris grant, and by virtue of a certain judicial sale of three-fourths thereof, the validity of which was disputed by the successors in trust of Dumas, which conveyances and sale were made before the organization of the state of West Virginia, one Louis Antoine des Verges de Maupertuis (sometimes called Mauperture) in 1872 and earlier claimed 300,000 acres of said tract; Robert E. Randall, trustee, claimed 200,000 acres thereof, and a mortgage upon said 300,000 acres for the unpaid purchase money therefor; and one Anthony Lawson claimed an undivided three-fourths of the entire 300,000 acres under said judicial sale. This was the status of the title when the Constitution of West Virginia was adopted in 1872. The complainant claims and exhibits title under all said persons.

Although not much more than 300,000 acres of said tract actually lies in the state of West Virginia, the rest being in Virginia and Kentucky, the said Anthony Lawson and his grantees, James Black and Abraham Suydam, were charged upon the landbooks of Logan county with taxes upon the three-fourths interest or claim at 375,000 acres from 1865 to 1878, when said interest was reduced by the county court to 100,000 acres, after which time said interest was charged to them and to their grantee, the Pittsburg National Bank of Commerce, up to and including the year 1882, all which taxes were paid. Notwithstanding the charging and collection of such taxes, said Randall, trustee, and the heirs of said Maupertuis, then deceased, being unacquainted with the location of said land, had the whole 500,000 acres entered upon the landbooks of Wyoming county in 1869, and charged with taxes thereon—the Maupertuis interest as 300,000 acres, and the Randall interest as 200,000 acres. In 1871 said 200,000-acre interest was sold to the state for unpaid taxes of 1870, and in 1877 the 300,000-acre interest was sold to the state for the unpaid taxes of 1874–75, the prior taxes having been paid. Afterwards, said land

not having been redeemed within one year from the sale, as provided for by the statute, a proceeding was instituted in the circuit court for Wyoming county by the commissioner of school lands on the part of the state to sell the said 500,000-acre grant for the benefit of the school fund, whereupon the said Randall filed his petition to redeem, and the Pittsburg National Bank presented a protest against such redemption, but by a decree entered therein April 10, 1883, it was decreed that Randall, as trustee of the Swan estate, and as creditor of Maupertuis, had the superior title and the right to redeem said 500,000-acre grant; and, the back taxes, interest, and costs being paid into court, the land was decreed to be thereby exonerated and released from all taxes up to and including the year 1883. The Pittsburg National Bank appealed from this decree holding the Randall title to be superior, but the appeal was dismissed upon the ground that the proceeding did not contemplate a contest and adjudication of rival claims of title. McClure v. Mauperture, 29 W. Va. 633, 2 S. E. 761.

The decree aforesaid ordered that the clerk certify a copy thereof to the Auditor of the State, and "also to certify, under the direction of Randall or his counsel, a copy thereof to the assessors of the proper assessment districts for taxation." The said 500,000-acre tract was not, however, again charged upon the landbooks of any county of the state of West Virginia in which any part thereof is situated within the five years next succeeding the year 1883, and in 1894 the state brought another suit in said Wyoming county circuit court against the present complainant, King, the said Randall, trustee, the said Pittsburg National Bank of Commerce, and sundry others, under whom King claimed, for the purpose of subjecting to sale for the benefit of the school fund so much of said 500,000-acre grant as was then vested in the state by alleged forfeiture thereof for the nonassessment of state taxes thereon for the five successive years after the' year 1883; and the said King filed his answer and petition therein, denying that said land was forfeited, but offering to pay any taxes that ought to have been charged thereon, with interest and costs of said suit, and on September 30, 1897, upon the payment of the taxes, interest, and costs fixed by the court therein, a decree was entered adjudging that said King had the right to redeem said land, and declaring said land, so far as the title thereto was in said state, to be redeemed, and all forfeitures and taxes charged or chargeable thereon to be released and discharged; said decree, providing, however, in conformity with the statute under which the suit was brought, that said "redemption shall not affect the rights that any person not party to this suit may have, if any, under the provisions of section 3 of article 13 of the Constitution of the state of West Virginia."

In 1859 Aly Hatfield procured from the officers of the commonwealth of Virginia who were by law charged with the duty of issuing grants of the waste and unappropriated land of the commonwealth the instruments purporting to be grants for said 450 and 330 acre tracts, and under proceedings in the circuit court of Logan county, instituted by the commissioner of school lands of that county, for the sale of waste and unappropriated land, Joseph Hatfield procured

a deed from said commissioner for a tract of 72 acres of land November 10, 1884, for 48 acres August 24, 1888, and for 140 acres March 14, 1889, upon a sale October 2, 1883. The defendants are sole heirs at law of Aly and Joseph Hatfield, who are now deceased.

As to these patents and deeds the complainant, in his bill, alleges:

"That at the time said pretended grants were issued the land therein described was wholly part and parcel of said Morris grant, and was owned by your orator's said predecessors in title, and was not waste and unappropriated land, or otherwise belonging to said commonwealth, nor within the power of the said commonwealth or of any officer thereof to grant and dispose of, as said Aly well knew, and said instruments were and are wholly null and void; but, being in due form, they purport and appear upon their faces to convey title to the land therein described, and can be shown to be invalid only by evidence aliunde. That all proceedings by said commissioner of school lands were purely ex parte and nonjudicial, and without notice to your orator's predecessor in title, the then owner of the said Morris grant; and at the time said tracts were reported and sold and said deed executed by said commissioner of school lands the said lands were not waste and unappropriated, nor forfeited, nor for any other cause subject to sale in any manner or on behalf of the state of West Virginia, as both said commissioner and said Hatfield well knew, and said proceedings were wholly without authority of law, and were coram non judice and void, and gave to said commissioner no right or authority to make sale of said land, or to execute said deeds therefor, and the same are fraudulent, null and void; but said deeds and proceedings, being in form of law, and being regular upon their faces, appear to convey title to the land therein described, and the invalidity of said deeds can only be made to appear by evidence aliunde."

The complainant, in his bill, refers to sections 3 and 6 of article 13 of the state Constitution, and contends that the provision making it the duty of the landowner to have his land entered on the landbooks has never been made operative by appropriate legislation, the duty of entering and charging lands devolving upon the public officers without the aid of the owner, under a complete statutory system; that the provision has no application to land that was on the landbooks at the time of the adoption of the Constitution; and that by the provision in the decree of redemption in 1883 Randall, complainant's predecessor in title, did all that could reasonably be required of him, in the absence of statutory direction, to cause the land to be re-entered upon the landbooks and charged with taxes, if the officers of the state had performed their statutory duty. The complainant alleges that the defendants claim that the title of complainant's predecessor in estate was forfeited in 1888, "by operation of said Constitution," by reason of nonassessment of taxes, and became thereby transferred to Joseph Hatfield to the extent of said 450 and 330 acre grants, the taxes on them having been paid; but the complainant avers that he "is advised and claims that the said provision of said Constitution purporting to forfeit lands for the nonassessment of state taxes for five successive years is in contravention of the Constitution of the United States, and is therefore null and void, and the title thereto could not and did not vest in defendants to any extent or in any manner; and that whether said provision be void, or for any reason valid, it is not the true meaning and intention of said Constitution to vest in any other persons title to any land, forfeited or otherwise, to which the title was not in the state at the time of the

adoption of said Constitution, and, so far as said Constitution purports or attempts, if it does, to transfer to or to vest in any person other than the former owner the title to any land thereafter to become forfeited for nonassessment, your orator is advised and claims that said Constitution is in contravention of the Constitution of the United States, and is null and void."

The foregoing being in brief the principal matters set out in the bill bearing upon the question to be considered, the defendants interposed their demurrer on the ground "that it appears from said bill that the title to the land claimed by complainant was by the Constitution of West Virginia forfeited to said state December 31, 1888, and that the title thereto vested in Joseph Hatfield, under whom these defendants claim, as to the tracts of 330 and 450 acres in said bill mentioned; and that, it being provided by the act of February 23, 1893 (Acts 1893, p. 57), under which the suit was brought in which complainant claims to have redeemed the land claimed by him, that the suit should be dismissed as to any lands that should appear to have been sold in any proceeding for the sale of school lands, said suit could not properly be maintained, nor any decree of redemption properly entered that should affect the lands claimed by these defendants under the sales thereof to said Joseph Hatfield by the commissioner of school lands."

So much of article 13 of the Constitution of West Virginia, relied upon by the defendants, as it is material to consider, is contained in sections 6 and 3, as follows:

"Sec. 6. It shall be the duty of every owner of land to have it entered on the landbooks of the county in which it, or a part of it, is situated, and to cause himself to be charged with the taxes thereon, and pay the same. When for any five successive years after the year 1869, the owner of any tract of land containing one thousand acres or more, shall not have been charged on such books with state tax on said land, then by operation hereof, the land shall be forfeited and the title thereto vest in the state. But if, for any one or more of such five years, the owner shall have been charged with state tax on any part of the land, such part thereof shall not be forfeited for such cause."

"Sec. 3. All title to lands in this state heretofore forfeited, or treated as forfeited, waste and unappropriated, or escheated to the state of Virginia, or this state, or purchased by either of said states at sales made for the nonpayment of taxes and become irredeemable, or hereafter forfeited, or treated as forfeited, or escheated to this state, or purchased by it and become irredeemable, not redeemed, released or otherwise disposed of, vested and remaining in this state, shall be, and is hereby transferred to, and vested in any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees,) for so much thereof as such person has, or shall have had actual continuous possession of, under color or claim of title for ten years, and who, or those under whom he claims, shall have paid the state taxes thereon for any five years during such possession; or if there be no such person, then to any person (other than those for whose default the same have been forfeited, or returned delinquent, their heirs or devisees,) for so much of said land as such persons shall have title or claim to, regularly derived, mediately or immediately from, or under a grant from the commonwealth of Virginia, or this state, not forfeited, which but for the title forfeited would be valid, or who, or those under whom he claims has, or shall have paid all state taxes charged or chargeable thereon for five successive years after the year 1865, or from the date of the grant, if it shall have issued since that year. * * *"

The question that the court has now to determine is whether the title that was originally vested by valid grant in Robert Morris, and appears to have descended by regular course of record conveyances to the complainant, has in fact been transferred, by due process of law, to the defendants to the extent of the land described in the patents and deeds acquired and claimed in hostility to the said Morris grant. The answer to this question involves not only the interpretation of the above-mentioned provisions of the Constitution of West Virginia, but the question of their consistency or inconsistency with the Constitution of the United States, and their consequent validity or invalidity.

It is contended on behalf of the complainant, both in the bill and in the argument of counsel, that the provisions of section 6 of the Constitution do not apply to any land that, like complainant's, was on the landbooks when the Constitution was adopted, and have not been made operative upon any land by proper legislation, and are not self-enforcing; that complainant's predecessor in title, Randall, did all that was reasonably in his power to have the land now claimed by complainant re-entered and charged with taxes on the landbooks after the redemption thereof in 1883, and that no forfeiture can be claimed because that was not done; that the Constitution does not intend, by said section 3, to transfer to third persons titles forfeited after the adoption of said Constitution, and that, so far as the said Constitution does purport or undertake to forfeit the title to land and vest it in third persons or in the state without any judicial proceedings or without any right of redemption, to that extent it is in contravention of the Constitution of the United States. The defendants dispute these propositions.

Provisions somewhat similar to that contained in said section 6 of article 13, requiring landowners to enter their lands on the landbooks, are found in the statutes of Virginia in the acts of February 5, 1810 (Acts 1809–10, p. 17, c. 16), and February 27, 1835 (Acts 1834–35, p. 11, c. 13). It was recited in the former act "that many persons omit to enter their land upon the land books and thereby elude the payment of any revenue thereon," and provided that, "if any person having title to a tract or tracts of land in this commonwealth shall fail to enter the same on the commissioners' book of that county in which the land lies within eighteen months after the passage of this act, the same shall be forfeited to the commonwealth." By the Act of February 9, 1814 (Acts 1813–14, p. 15, c. 3), forfeitures under the act of 1810 were released, and a system provided for the entering and charging of lands by the commissioners of the revenue. The act of 1835 recited that it was known to the General Assembly that "many large tracts lying west of the Alleghany Mountains, granted before April 1, 1831, never were or for many years last past have not been entered on the books of the commissioners of the revenue," and required that "every owner or proprietor of any such tract or parcel of land should on or before July 1, 1836, enter or cause to be entered on said books" all such lands owned by him, her, or them, and have the same charged with all the taxes and damages in arrear or properly chargeable thereon, and pay the same; and prescribed

the penalty of forfeiture for their failure to do so. This act applied only to lands omitted prior to 1831. Lands other than those that "never were or had not for many years past" been on the books could well be found and entered by the commissioners without assistance from the owners. An act passed April 1, 1831 (Acts 1830–31, p. 94, c. 28), provided that no person in any suit then pending or thereafter to be brought for the recovery of land west of the Alleghany Mountains against a bona fide claimant under a grant from the commonwealth issued prior to the passage of the act, who had had said land entered on the landbooks and paid all taxes thereon, should be allowed to give in evidence any grant from the commonwealth in support of his title to the demanded premises, unless he should show that he too had had the demanded land entered upon the landbooks and charged with taxes, and had paid all taxes chargeable thereon. The case of Taylor v. Burdett, 11 Leigh, 347, arose under this act in 1835, upon a grant dated June 16, 1786, under which the plaintiff claimed, and which was excluded by the circuit court. In reversing this ruling the Court of Appeals, per Judge Tucker, said in part:

"First, as to entering the land with the commissioner. This was first required by the act of 1810, and accordingly it appears that the lands were on the commissioner's books in 1811, for they are on the auditor's list as delinquent for that year. Now, if they were once on the books, it would seem that this duty was fulfilled, as it was not required to be repeated every year."

The reasoning and authority of that case seem conclusive against any forfeiture of the Morris grant, so far as forfeiture is the penalty of any fault, default, or delinquency of the owner; for it appears that said tract had been entered by its owners and continued on the landbooks of both Wyoming and Logan counties long before, at the time of, and long after the Constitution of West Virginia was adopted; and in the language of Judge Tucker "it would seem that that duty was fulfilled, as it was not required to be repeated every year," at least not by express terms, nor by any inference warrantable, when so terrible a consequence as the forfeiture of thousands of dollars worth of property is to follow such inference. Only the most clear and cogent language, or a manifest condition of affairs demanding it for public well-being, would warrant such a construction of the first clause of section 6 as would extend the duty of landowners beyond a primary compliance with the requirement of that clause, with a penalty of forfeiture for failure in that respect, in spite of the fact that the state has nowhere and at no time made definite provision for the discharge of such duty by the owner, but has, by a system the most elaborate and complete, provided for the entering and taxing of lands by her public officers.

The early Virginia acts were occasioned by the fact that many large tracts of land "never were or had not been for many years" entered on the landbooks, and consequently were not within the knowledge of the taxing officers. When they were once put on the books, and went into the hands of the officers, those officers could see to the taxing of them thereafter, which was a part of their official duty; and after 1835 Virginia did not require land to be entered by the owners under penalty of forfeiture.

After the erection of the state of West Virginia, and after the close of the Civil War, during which courthouses were burned, landbooks lost, records destroyed, many landowners killed or scattered, and the evidence of ownership of land left in such condition that the public officers could not, in many instances, either from their own knowledge or from any record information, properly enter and charge all lands, it was made the duty of landowners to have their lands entered on the landbooks of the proper counties. When that was once done, the land came under the control of the public officers; and so complete and specific is the provision of the law governing the subject (chapter 29 of the Code of West Virginia of 1887) existing prior to the formation of the state and ever since, that a tract of land once on the landbooks will ever after continue on them, and be charged with taxes year after year so long as the officers of the state appointed and paid for the purpose attend to their duties. It is not in the power of the owner to prevent such charging, and nothing he can do can get the land off the books. Only in the event of a sale to the state for unpaid taxes, in which event it ceases to be chargeable, can the land get off of the books, except solely by the fraud or negligence of some public officer. To hold, then, that the duty imposed on the landowner by said section 6 is not fulfilled if at the time of its adoption or afterwards he had his land entered on the landbooks, and charged with taxes, is not required by the language of that section, nor by anything to be found in the condition of things existing at its adoption or afterwards. Indeed, it seems not even to be permitted by the language: "But if for any one or more of such five years the owner shall have been charged with state tax on any part of the land, such part thereof shall not be forfeited for such cause." This applies to the whole tract as well as to "any part" of it. To what time do the words "any one or more of such five years" refer, if not to any one or more of "any five successive years after the year 1869"? Is not all forfeiture under this section expressly prevented by a charging of the land for any year, at least if charged before the full five years next after 1869 expired? It is clear to my mind that if the tract, or any portion of it, was entered within said five years, as provided for in section 6, it could not be forfeited.

If the position here taken be sound, there could be no forfeiture of the land in question by the Constitution as a penalty for the default of the owner. Any forfeiture for nonassessment must be independent of any act or default of the owner. But suppose the duty of the landowner to have his land entered, etc., arises every time they get off the books for any cause, what is the situation presented by this case? The Supreme Court, in King v. Mullins, 171 U. S. 404, 18 Sup. Ct. 925, 43 L. Ed. 214—a case arising upon the provision in question—answering the argument that "the land may be forfeited by reason of the landowner not having been in fact charged on the landbooks with the taxes due from him, although he was not responsible for such neglect," said:

"We do not so interpret the state Constitution or the statutes enacted under it. If the landowner has done all that is reasonably in his power to have his land entered upon the landbooks, and to cause himself to be charged with taxes

thereon, no forfeiture can arise from the owner not having been charged on such books with the state tax. The state could not acquire any title to the lands merely through the neglect of its agent having custody or control of its landbooks."

It cannot be denied that the owner of the Morris grant did all that, in the language of Mr. Justice Harlan, was "reasonably in his power to have his lands entered upon the landbooks, and to cause himself to be charged with taxes thereon." In determining what is "reasonably" in the power of the landowner, and what negligence, which can occasion the state no loss whatever, should subject him to the dire consequence of losing his land, the state, through her agents, being in default, we must bear in mind that we are dealing with forfeitures, odious in law, which courts will not enforce where there is any escape; that the landowner is without precedent, guide, or direction for the discharge of his duty; and that the requirement is in invitum. It appears that the land had been purchased for the state at a sale for delinquent taxes prior to 1883, and the state, through her commissioner of school lands, had instituted proceedings in the circuit court to dispose of the land under a statute which permitted the owner or person in whose name it was sold to come in and redeem. The state, the claimant, and the land were all before the court, and it was ordered by the very same decree that permitted payment to the state of the redemption money, which was accepted and applied by her, that the clerk of the court, a public officer charged by the statute with that duty, should certify a copy of the decree to the State Auditor, and also certify copies to the county assessors for taxation, the latter under the direction of Randall or his counsel. This seems to have been all that the court, the state, and Randall supposed to be necessary to insure the re-entering of the land upon the landbooks. It was, in effect, a direction by the court as to what was necessary in the matter. As the law authorizing assessors to enter the land upon the landbooks had very recently been repealed, and that duty required to be performed by the clerks of the county courts, and as the circuit court clerk was required by law, independently of the direction in the decree, to certify to the clerk of the county court an abstract of the decree, and of that clerk to enter the lands, this requirement of the decree that a copy be certified to the assessors was ineffectual and unimportant, and it is immaterial whether or not it was complied with. This decree having been passed by the court upon the petition of Randall, he had the right to rely upon it, and had reason to suppose that the land would go back on the landbooks without further action by him, and that there was nothing more that he, a nonresident trustee, need do; neither the Constitution, the statute, nor anything else but the decree giving any direction or hint as to how he should proceed to "have" his land entered.

When the fact that the land is subject to entry and taxation upon the landbooks has been brought to the attention of the officers or agents of the state charged by statute with the matters of assessment and taxation, it should seem that the landowner should not suffer the forfeiture and transfer of his land to the state or to a

stranger because of the negligence of such officers; yet if the state, since 1883, or these defendants, has or have acquired any title to the land claimed by the complainant, it has been "merely through the neglect of the agent of the state having custody or control of its landbooks," but for which neglect no question of forfeiture could possibly have arisen. I do not overlook the proceeding in the court of Wyoming county and the decree of redemption, so called, of 1897. In that suit King denied that the land was forfeited, but offered to pay any taxes that might be chargeable thereon. The decree does not adjudge that the land was forfeited, but releases it from the taxes chargeable and any forfeitures that there may have been, subject to the rights of persons, not parties, claimed under the Constitution. The principal effect of the decree of September, 1897, is to eliminate the state and cut off the general defense of title outstanding in the state, which the defendants might otherwise have sought to rely upon. This is not their defense, however, except as to the tracts sold by the commissioner of school lands, as to which they say the decree was improperly entered. Their contention is that the title to the land in controversy is in them, and not in the complainant or the state.

If the construction of the provisions of the state Constitution under consideration, and the question of what acts and facts bring lands within their operation, rested ultimately with this court, instead of the state Supreme Court, I might be content to pursue this discussion no further, but, being uncertain whether that court will concur in the views I have expressed, I prefer to rest my decision of this cause also, and principally, upon a decision of the graver and more fundamental question presented by this record—the question of the constitutional validity of those provisions; and in reaching my conclusion I am not unmindful of the respect due to the laws and authority of the state, but I am controlled by what I consider to be the spirit and meaning of the federal Constitution. The Constitution is not the supreme law of the land if it be not given effect according to the letter and spirit, in all the states alike, at all times and in all circumstances, or if all or any doubts be resolved against it. It is contended on behalf of the defendants that, by reason of the fact that the tract of land now claimed by complainant was not charged with taxes upon the landbooks within the five years following the redemption thereof in 1883, the title of said land, then held by Reed, trustee, under whom the complainant claims, became forfeited on the last day of the year 1888, and vested, by force and operation of the Constitution, in Joseph Hatfield to the extent of said 450 and 330 acre tracts, which are not affected, and do not purport to be affected, by the decree of the Wyoming county circuit court of 1897, and that said decree should not affect the "school lands" tracts, because the suit in which it was rendered should have been dismissed as to such tracts. Concerning the lands claimed by the defendants, it is sufficient to say that the patents under which they claim, having been issued after the grant to Morris, and when the title to that grant was unquestioned and unquestionable, gave no right whatever to the land embraced in them within the Morris grant;

and the proceedings in the circuit court of Logan county, had before the five years after 1883 had expired, were unauthorized, and were coram non judice, and the deeds made thereunder were nullities. If, then, the defendants have title or any right to any of the land embraced in the Morris grant and in said patents and deeds, they have got it solely by operation of the Constitution of West Virginia.

It is claimed by counsel for the complainant that section 3 is not a law, but a legislative grant, operating only upon land that was at the time the Constitution was adopted subject to the disposal of the state; that the words, "shall be and is hereby transferred to and vested in," are not words of lawmaking, but words of grant in præsenti, and cannot affect land to which the state did not have title in 1872, so as to convey it to some person, perhaps not they in being, when afterwards the state should happen to acquire title and such person should come into being; and that, therefore, the lands claimed by the defendants do not come within the operation of that section, nor any lands within the saving clause of said decree of 1897. It cannot be denied that there is great force in this position; but, as the section speaks of lands "hereafter forfeited," and as the act of February 23, 1893, commonly called the "School Land Act," seems to provide for the redemption only of lands forfeited to West Virginia, which redemption is not to affect any lands held under said section 3, and as there could be no lands forfeited to West Virginia for nonassessment prior to the adoption of the Constitution, that section would seem to have no operation upon lands forfeited by the Constitution, unless construed to operate in the future, which seems to be the construction given to it by the state court, so far as can be determined from expressions found in the few cases in which it has been before it in any way.

Giving, then, to these provisions of the Constitution and the school land act the application contended for by the defendants, we have the result that by mere act of ostensible legislation, without any proceeding or action whatever, judicial or otherwise, before or afterwards, the full legal and equitable fee-simple title to land is taken out of one private person, without compensation, and vested, without consideration, in another private person for his private use and benefit. This result can only be avoided by adopting a construction of the provisions of the Constitution and act in question that would leave them little meaning, or by denying them legal validity so far as they apply to cases like the present. Can such a result legally obtain under the Constitution of the United States? It was held by the Supreme Court in King v. Mullins, supra, that this forfeiture provision of the West Virginia Constitution, when considered and applied in connection with the statutes that authorize a suit to be brought by the state against the claimant of the land affected, in which all questions of title, location, and boundary, etc., can be tried, and in which the landowner can redeem, does not deprive the landowner of his property without due process of law; the court reserving its opinion upon the question whether the state Constitution, "alone considered," is consistent with the national Constitution, until the decision of that question should become necessary. That ques-

tion is now presented.  In the Mullins Case the defense was merely that the title claimed by the plaintiff was outstanding in the state, not that it had been by forfeiture vested irredeemably in the defendants.  There was nothing that appeared in the record of that case to show that there was any legal obstacle to .the full and effectual redemption by the plaintiff of every acre of the grant claimed by him.  It had previously been held by the state court that these statutes had no application, and that no suit provided for by them could be instituted, except as to land the title to which had theretofore vested in the state in some legal way; and it would, seem that the inquiry as to what is due process of law should be confined to the act of deprivation by which the state had acquired the title and the landowner had lost it, without looking to any later provision by which the person deprived may in some cases have restitution.  But in cases like the present there is no refuge in the statute and the suit thereunder.  The suit of the state cannot, according to the statute, be maintained against any land to which the title is not then in the state. Section 6, Act Feb. 23, 1893 (Acts 1893, p. 60), provides:

"And if at any time during the pendency of any such suit, it shall appear to the court that any part of any tract of land in question therein has been sold by the state in any proceeding for the sale of school lands, and the taxes regularly paid thereon since such sale, or is held by any person under section 3 of article 13 of the Constitution of this state, the bill, as to such part, shall be dismissed, and the suit proceeded with to a final decree as to the remainder."

If that fact should not appear to the court, and the suit should proceed as to such land, and a claimant be permitted to pay the taxes thereon and get a decree of redemption, the same act (section 17, Acts 1893, p. 66) provides:

"But such redemption shall in no wise affect or impair any right, title, or interest any other person may have in said real estate or any part thereof, by purchase from the state, or under and by virtue of section 3 of article 13 of the Constitution of this state."

This provision is found in all prior acts, and it would result, independently of this provision, that, if the Constitution had previously transferred the title of the complainant to another person, no proceeding that the Legislature could devise could divest that other person of the title, and revest it in the original owner.  And since the title must be divested before it can revest, it likewise results that where it is vested by the Constitution in any person the former owner of that title must have been deprived of it by the Constitution, or by something anterior to it, and not in any measure by any proceedings subsequently had.  Due process must be found, in such a case, in the operation of deprivation—in the Constitution alone considered; and if, as I understand the opinion of the Supreme Court in King v. Mullins, the Constitution was held to be valid by reason of the support given by the judicial proceedings provided by statute and the right of redemption therein, then that provision of the Constitution is inoperative where that support fails.  That the right of redemption, which was held to put the landowner in a position where he had no substantial right of complaint—none that he could not

remove by a payment of his taxes—was the most potent considera-
tion with the court in sustaining the validity of the Constitution and
statutes considered as a system, upon reasoning that does not seem
to me wholly satisfactory, is obvious from the declaration of the
court that that part of the Code "which has the most direct bearing
on the question" is the provision (Code W. Va. 1887, c. 105, § 14)
by which the former owner is permitted "to redeem such part or
parts of any tract of land so forfeited, or the whole thereof, as he
may desire" (page 426, 171 U. S.; page 933, 18 Sup. Ct., 43 L. Ed.
214), and which it deemed a "remedy whereby he could be relieved from
such forfeiture" (page 423, 171 U. S.; page 932, 18 Sup. Ct., 43 L.
Ed. 214). But, as has been seen, he cannot redeem any of his land
that falls within any of the three classes mentioned in section 3,
art. 13, Const. W. Va.; as, for instance, any land upon which a claim-
ant under a junior patent has paid five years' taxes—the situation
of the lands claimed by the defendants. If we assume a case of a
tract of 1,000 acres alleged to be forfeited, which is entirely covered
by a larger junior grant coming within the terms of said section 3,
it is obvious that the claimant could never redeem a foot of it; that
the court would not permit the state to file a bill that disclosed that
situation; that no judicial inquiry or proceeding concerning it is au-
thorized or permitted; and that any apparent redemption that might
be had would be ineffectual. The whole matter would begin and
end with the constitutional provisions; and that is the case with any
tract to the extent of such adverse claims. To the Constitution only
must we then look, and see if "by operation" thereof it provides
that "due process of law" by which only a state may deprive any
person of his property. If by that operation it furnishes no such
due process, then I hold that sections 3 and 6 of article 13 of the Con-
stitution, forfeiting the title of one citizen to his land and transfer-
ring that title to another, is null and void.

Both in England and America forfeitures and confiscations have
always been odious, and it is therefore incumbent upon parties who
claim property by virtue of a forfeiture to establish the validity of
such forfeiture, consistently with the federal Constitution, by control-
ling precedent or by convincing reasoning. Such precedent in sup-
port of the claims of the defendants is sought in the Virginia act of
February 27, 1835, already mentioned, and cases arising upon it
which departed from the long-established rule of law that an inquest
of office, or some judicial proceeding or its equivalent—some public
transaction subsequent to the commission of the act out of which the
forfeiture arose—was necessary to the actual divestiture of the title,
the completion of the forfeiture.

There are points of similarity between the act of 1835 and the
provisions of the Constitution of West Virginia under consideration,
but the points of difference are such that that act, itself an anomaly
in legislation, cannot stand as a precedent for the constitutional
provisions. That act related to lands omitted prior to 1831, not to
all lands that were then omitted, not to lands that had been admitted
only since 1831, nor to any lands that might be omitted any time in

the future, and only to land in that terra incognita the region "west of the Alleghany Mountains." It was directed at a certain class of persons who had been long delinquent in the past. It did not deal with future delinquencies. It had no operation in the future beyond the day set when the lands should be entered and the back taxes paid or the penalty of forfeiture incurred. It ceased to have force or effect after that day. It did not need to be repealed to arrest its action. It became functus officio by its limitation. The Constitution, on the other hand, has reference not to the past, but to the future. No particular day is named on which to suffer or avert the forfeiture. It does not cease to operate at a fixed date, but goes on until arrested by repeal. Whatever may be the advantage of one over the other in point of merit or legality, the act of 1835 can be regarded as a precedent only for an exactly similar act.

The cases that have construed the act of 1835—Statts v. Board, 10 Grat. 400; Wild's Lessee v. Serpell, Id. 405; Hale v. Branscum, Id. 418; Levasser v. Washburn, 11 Grat. 572—are not applicable as authority in the present case, both because of the difference in the two measures and the conditions that existed when they were enacted, and because I fail to find any reasons assigned to support the conclusions of the court except they were enforcing the terms of the statute under which the proceedings were had. The court was content to declare simply how the act took effect, and that the enactment was "within the constitutional competency of the Legislature." But it should be noted that the Constitution of Virginia did not then contain the prohibition, found probably in the Constitution of every other state, against depriving a person of property without due process of law; the provision being "that no man be deprived of liberty except by the law of the land or the judgment of his peers." The Legislature of Virginia had, prior to the fourteenth amendment, a power over property, so far as express restraint was concerned, that no other state, so far as I am advised, has ever had.

The objection that the act of 1835 was unconstitutional as wanting in "due process" has never arisen in Virginia, and it is too late now for such a question to arise, because due process was not required by the Constitution of Virginia, and because the fifth amendment to the Constitution of the United States, which provided that no citizen could be deprived of his property without due process of law, was a limitation upon the powers of the federal government only (Barron v. Baltimore, 7 Pet. 247, 8 L. Ed. 672), and because the act of 1835 had ceased to have any operation for over 30 years before the fourteenth amendment was adopted; and while that amendment would have annulled the act, by reason of its repugnance, if it had been one of continuing operation, and had been then in force, it could not reach back over the intervening 30 years to nullify the effect of an act that was not, when it was passed and when it passed out of existence, in conflict with any existing Constitution. So, when the Supreme Court, in Armstrong v. Morrill, 14 Wall. 120, 20 L. Ed. 765, gave effect to the act of 1835, "as construed by the Supreme Court or court of appeals of the state," it did not pass upon, and

had no power to question, the validity of the act for want of due process, and no such question arose.

The proposition that the West Virginia forfeiture is due process of law under the fourteenth amendment, because, as it is contended, such forfeitures were "the law of the land" in this state and in Virginia when the amendment was adopted, is shown to be unsupported when we consider that at that time West Virginia had never passed a forfeiture act, and that there was none in force in Virginia, either at that time or at the time when West Virginia was made a state, and had not been for many years, and that there never had been any of a general or continuous operation. But whatever may have been the power of any state over the life, liberty, or property of persons under its own Constitution or the rulings of its own courts, prior to the adoption of the fourteenth amendment, it was intended that thenceforth the life, liberty, and property of the citizen should be held "secure from the arbitrary exercise of the powers of government unrestrained by the established principles of private rights and distributive justice." Scott v. McNeal, 154 U. S. 34, 14 Sup. Ct. 1108, 38 L. Ed. 896. It cannot be that that amendment only looked to the prohibition of new wrongs yet to be invented, and left the states free to repeat even those that had called forth that amendment.

In White v. Crump & Shanklin, 19 W. Va. 583, 592, it was held that:

"Before the ratification of the fourteenth amendment to the Constitution of the United States, the Legislature might, if authorized by the state Constitution, divest vested rights of property where such rights were not vested by contract; that since the ratifications of said amendment such vested rights of property can only be divested by a state by due process of law."

While the courts have not, in general, undertaken to give a comprehensive definition of "due process of law," they have, with complete concurrence, declared what is not due process of law in cases of various exertions of asserted power, which is quite as much to our present purpose. Thus it has been held:

"'Due process of law,' without which the Constitution declares no person shall be deprived of life, liberty, or property, is not merely an act of the Legislature. * * * In Wynehamer v. People, 13 N. Y. 378, Comstock, J., says: * * * 'To say, as has been suggested, that "the law of the land," or "due process of law," may mean the very act of the Legislature which deprives the citizen of his rights, privileges, or property, leads to a simple absurdity. The Constitution would then mean that no person should be deprived of his property or rights unless the Legislature shall pass a law to effect the wrong, and this would be throwing the restraint away.' * * * Selden, J., in the same case, says: 'To give this clause [of the Constitution above referred to] * * * any value, it must be understood to mean that no person shall be deprived by any form of legislative or governmental action of either life, liberty, or property, except as the consequence of some judicial proceeding appropriately and legally conducted. It follows that a law, which, by its own inherent force, extinguishes rights of property, or compels their extinction without any legal proceedings whatever, comes directly in conflict with the Constitution.'" Baker v. Kelley, 11 Minn. 480 (Gil. 358).

"It must be ascertained judicially that he has forfeited his privileges, or that some one has a superior title to the land he possesses, before either can be taken from him. It cannot be done by mere legislation. If the Legislature can take the property of A. and transfer it to B., they can take A. himself, and either shut him up in prison or put him to death. But none of these

things can be done by mere legislation. There must be due process of law." Taylor v. Porter, 4 Hill (N. Y.) 145, 40 Am. Dec. 274, per Judge Bronson.

"By 'the law of the land' is meant not that arbitrary edict of any body of men—not an act of the assembly, though it may have all the outward form of the law—but due process of law, by which either what one alleges to be his is adjudged not to be his, or is forfeited upon conviction by his peers of some crime for which it was by law subject to forfeiture when the crime was committed. If this be not so, every restriction upon legislative authority would be a vain formula, without life or force. If an act of assembly can deprive a man of his property without trial and judgment, for even legal cause of forfeiture, it may in like manner deprive him of his life or his liberty, imprison him in a dungeon or hang him without judge or jury." Palairet's Appeal, 67 Pa. 479, 5 Am. Rep. 450, per Judge Sharswood.

"Forfeiture of rights and property cannot be adjudged by legislative act; and confiscation without a judicial hearing, after due notice, would be void, as not being process of law." Calhoun v. Fletcher, 63 Ala. 574, quoting Cooley's Const. Lims.

"An act of the Legislature is not the due process of law mentioned in the Constitution. The words, as remarked by Judge Bronson in the case last cited [Taylor v. Porter], cannot mean less than a prosecution or suit instituted and conducted according to the prescribed forms of ascertaining guilt or determining the title to property; in other words, a man cannot be legislated out of life, liberty, or property." People v. Toynbee, 20 Barb. 219.

These authorities, and a multitude of others to the same effect from all parts of the country, are conclusive of the objection to the provisions of the state Constitution under consideration. Taken together, those provisions do not contemplate nor permit the intervention or aid of any judicial or other proceedings, but purport by their own operation to effect the divestiture and transfer of title. This is not due process of law. As was said by the Supreme Court of Virginia (Martin v. Snowden, 18 Grat. 100) of a less objectionable act, "literally speaking, it is not any process at all."

It is not important at this time to inquire what is or what is not due process in proceedings for the assessment and sale of land for taxes. Due process in such cases relates to the regularity of the assessment, the levy, the notices of delinquency or proposed sale, to the sale and the report of sale, etc. It can have no application where, as in the case at bar, there is nothing to which it can apply— where the whole scheme, process, and operation of taxation is wanting, and the object savors of land robbery. If the land in this case had been taxed and sold, the question of assessment, sale, and deprivation without the due process applicable to such proceedings might have arisen, but the question of forfeiture never could arise. It is not a matter of taxation. The Constitution does not even put it under the head of "Taxation," but under the head of "Land Titles."

The Constitution undertakes to forfeit tracts of 1,000 acres and more, and not tracts of less than 1,000 acres, and it is urged that for want of just ground of such discrimination it is repugnant to the equality clause of the fourteenth amendment. In King v. Mullins the Supreme Court held that the discrimination was reasonable because of the difference in the facilities for ascertaining the extent and boundaries of large and of small tracts for purposes of assessment and taxation. The court was probably not aware that under the method of assessing lands in West Virginia, unlike that followed in most of the states, lands are not described on the landbooks by their

boundaries, but only by the number of acres stated in the deed or grant and by the general locality. Since that decision the Supreme Court of Appeals of West Virginia, in State v. Swann, 46 W. Va. 128, 33 S. E. 89—a case in which it was urged that an act of the Legislature, passed subsequently to the Constitution, forfeiting tracts of less than 1,000 acres, was within an implied prohibition of section 6, art. 13, of said Constitution—said, per Judge English:

"I think not, and see no good reason why a man owning 990 acres of land, who neglects to have it entered upon the landbooks, should be protected from forfeiture when one holding 1,005 is not."

This ruling of the state court is conclusive that there is no good ground for the classification and discrimination made by the state Constitution, which thus comes under the prohibition of the equality clause of the amendment. But the court asks: "What is to prevent the constitutional provision and the act from standing together?" The answer is obvious. The Constitution being adopted before the act was passed, and being then in contravention of the equality clause of the fourteenth amendment, it was void and inoperative, and could not stand by itself till it had the statute to stand with, even if they could have stood together if adopted contemporaneously; and, the provision of the Constitution being void and dead, it could not be revived or validated by subsequent action of the Legislature. But whatever aid the constitutional provision could get from a statute while in force forfeiting what the Constitution spared, it can get none now, because the act of 1882 (Acts 1882, p. 387, c. 130), which by implication repealed the act of April 9, 1873 (Acts 1872–73, p. 308, c. 117), forfeiting lands for nonassessment for five years "after" its passage, provides for forfeiture of tracts less than 1,000 acres for nonassessment only for five successive years "since" the 9th day of April, 1873, which expression, by its terms, covers the period of the time from April 9, 1873, the date of the passage of the act of 1873, to the time of the passage of the act of 1882, and no more; so that there is now, and has been since 1882, no law attempting to forfeit tracts of less than 1,000 acres for nonassessment either "after" or "since" 1882, and the constitutional provision stands—or rather falls —alone.

But the most serious objection to the provisions in question is that they undertake to take the lawfully acquired property of one private person without his consent, and bestow it gratuitously upon another private person for his private use and enjoyment. If these provisions are effectual, the fee-simple title to land which one instant before midnight on the last day of the year 1888 was in John R. Reed, trustee, was, without his act, knowledge or consent, without hearing, notice, complaint, or proceedings of any kind, at one instant past midnight transferred from him and vested in Joseph Hatfield, without his knowledge or request, and without any action of any human being, but by the mere effluxion of time and the operation of the pre-existing legislative act, the Constitution. One instant Hatfield owned nothing, the next he had title to 780 acres of Reed's land. Reed owed Hatfield nothing, was under no legal, moral, or other obligation to him, had done him no harm, and derived and

expected no advantage in any way from him. Hatfield had asked nothing, and had no right to ask or expect anything, from Reed. Neither, probably, was aware of the existence of the other. As between them and the state, Hatfield and his predecessors had paid the state taxes on 780 acres for 28 years at the utmost. Reed's predecessors had paid the state taxes on 875,000 acres for 18 years, and on 500,000 acres for more than half a century, aside from taxes remitted in 1838. No compensation was exacted from Hatfield either for Reed or for the state. No obligation or duty towards either was put upon him by reason of this donation. All things remained as they were before, except that the state had taken Reed's title to certain land out of him and put it into Hatfield. It requires neither authority nor argument to show that such a transfer cannot be a valid exercise of governmental power. The very sense of justice revolts at it. Free government could not exist where such a power existed. The courts, with one voice, have denied the existence of such power wherever it has been asserted.

The Supreme Court, in Holden v. Hardy, 169 U. S. 366–390, 18 Sup. Ct. 383, 42 L. Ed. 780, says:

"Recognizing the difficulty of defining with exactness the phrase 'due process of law,' it is certain that these words imply a conformity with natural and inherent principles of justice, and forbid that one man's property, or right to property, shall be taken for the benefit of another, or for the benefit of the state, without compensation."

It was said in Bloodgood v. M. & H. R. R. Co., 18 Wend. 56, 31 Am. Dec. 313:

"It has never been allowed to be a rightful attribute of sovereignty in any government professing to be founded upon fixed laws, however firm the government might be, to take the property of one individual or subject and bestow it upon another. The exercise of such a power would be incompatible with all government, and would subvert the foundation principles upon which the government was organized."

The Supreme Court, in Davidson v. New Orleans, 96 U. S. 102, 24 L. Ed. 616, says:

"It seems to us that a statute which declares in terms, and without more, that the full and complete title to a described piece of land, which is now in A. shall be, and is hereby, vested in B., would, if effectual, deprive A. of his property without due process of law, within the meaning of the constitutional provision."

And the same court in Chicago, Burlington & Quincy Railroad v. Chicago, 166 U. S. 266, 17 Sup. Ct. 992, 41 L. Ed. 994, referring to this language, says:

"Such an enactment would not receive judicial sanction in any country having a written Constitution distributing the powers of government among three co-ordinate departments, and committing to the judiciary, expressly or by implication, authority to enforce the provisions of such Constitution. It would be treated, not as an exertion of legislative power, but as a sentence—an act of spoliation."

In Wilkinson v. Leland, 2 Pet. 657, 7 L. Ed. 542, the court, speaking by Mr. Justice Story, said:

"We know of no case in which a legislative act to transfer the property of A. to B. without his consent has ever been held a constitutional exercise of

power in any state in the Union. On the contrary, it has constantly been resisted as inconsistent with first principles by every judicial tribunal in which it has been attempted to be enforced."

In Loan Association v. Topeka, 20 Wall. 664, 22 L. Ed. 455, it is declared:

"To lay with one hand the power of the government on the property of the citizens and with the other to bestow it upon favored individuals * * * is none the less robbery because done under the forms of law and called 'taxation.' This is not legislation. It is a decree under legislative forms. Nor is it taxation."

The Supreme Court of West Virginia, in Varner v. Martin, 21 W. Va. 534, 548, Judge Green, on behalf of the court, says:

"It is true that there is neither in our Constitution nor in the Constitution of other states any express provision forbidding that private property should be taken for the private use of another, or any constitutional provision forbidding the Legislature to pass laws whereby the private property of one citizen may be taken and transferred to another for his private use, without the consent of the owner. It was doubtless regarded as unnecessary to insert such a provision in the Constitution or Bill of Rights, as the exercise of such an arbitrary power of transferring by legislation the property of one person to another without his consent was contrary to the fundamental principles of every republican government; and in a republican government neither the legislative, executive, nor judicial department can possess unlimited power. Such power as that of taking the private property of one and transferring it to another for his own use is not in its nature legislative, and it is only legislative power, which, by the Constitution, is conferred on the Legislature. Such an act, if passed by the Legislature, would not, in its nature, be a law, but would really be an act of robbery; the exercise of an arbitrary power not conferred on the Legislature. There is an entire concurrence of all the authorities in the proposition that private property cannot be taken for private use, either with or without compensation."

It has been suggested that in the present case the property transferred by legislative act to a private person is not the property of another private person, but of the state, and that the state can do with its property as it sees fit; that for the mere point of time without duration, where one joined another, the title of Reed became the property of the state before it passed into Hatfield, so that the state gave its own land, not the land of another. I cannot give my assent to that proposition for the reason that the transfer to the state would only by "mere legislative act," not for any public purpose, but for the purpose of the gratuitous transfer to another private person for his own private uses, and without the right of redemption. It would be a taking from one person and giving to another by the state, even though it became the property of the state for an instant of time. No such evasion of the federal Constitution could be tolerated; but it appears that the title does not vest in the state at all, for by said section 3, if effectual, it has previously been transferred to the junior claimant.

The language of the Constitution is, "All title to lands in this state * * * hereafter forfeited * * * shall be and is hereby transferred to and vested in any person," etc., so that when the title becomes forfeited it is to vest, not in the state, but directly in "any person," etc., if such there be, constituting the legislative transfer of A.'s property to B. without A.'s consent, which the Supreme Court

has repeatedly said never has received, and never can receive, judicial sanction under a constitutional government.

My attention has been called to sundry cases thought to militate against the views here expressed. It is unnecessary to analyze them. They arose upon wholly different states of facts from the case at bar, and, properly understood, are found to have no application to the present case, nor to have the effect supposed. I have found no well-considered decision, nor is it hazarding too much to predict that none will ever be found, to sustain the position that there is any legal power in the government, state or national, to transfer by mere legislation the property of one private person, without his consent, to another private person for his private use, for any cause whatever, or that a legislative act can become "due process of law" by the mere act of its adoption—which are the important questions in this case.

My opinion and conclusion is that the aforesaid provisions of the Constitution of West Virginia and the statutes of that state, so far as they purport or undertake to forfeit and divest the title of any person to his land and vest the same in any other private person, or to vest the same in the state without provision for redemption by or on behalf of such owner of the whole or such part of said land as he may desire to redeem, or without provision for a sale thereof and the return of the proceeds to such owner after deduction of all taxes and proper charges therefrom, are attempts by said state to deprive a person of his property without due process of law, and are prohibited by the Constitution of the United States, and that there can be no valid forfeiture where such right of redemption or receipt of proceeds is prohibited or not provided for.

It does not appear that the defendants have paid all taxes "since the sale" upon the tracts claimed by them under the commissioner of school lands, so as to bring them within section 6 of the school land act of 1893 (Acts 1893, p. 59), requiring the state's bill to be dismissed as to such lands. They are therefore not withdrawn from the provision for redemption nor from the operation of complainant's decree. But if they were withdrawn, then for the reasons above stated there could be no valid forfeiture of complainant's title thereto, and it would still be in him. The title to the land in controversy appears from the bill to be in the complainant, and he appears to be entitled to the relief prayed for.

The demurrer will be overruled, with leave to the defendants to answer.